The PEOPLE of the State of Colorado,
Petitioner/Cross–Respondent,

v.

Adriel BORGHESI, Respondent/Cross–
Petitioner.

No. 01SC479.

Supreme Court of Colorado,
En Banc.

March 24, 2003.

As Modified on Denial of Rehearing
April 14, 2003.

Ken Salazar, Attorney General, Anthony J. Navarro, Assistant Attorney General, Appellate Division, Criminal Justice Section, Denver, Colorado, Attorneys for Petitioner/Cross–Respondent.

David S. Kaplan, Colorado State Public Defender, Martin Gerra, Deputy State Public Defender, Denver, Colorado, Attorneys for Respondent/Cross–Petitioner.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

Defendant Adriel Borghesi was convicted of three counts of aggravated robbery. Two of the convictions were based upon an incident involving the taking of a store's proper-

ty from two employees. The third conviction was based upon a separate and later incident involving a taking of the same store's property from a single employee. In *People v. Borghesi*, 40 P.3d 15 (Colo.App.2001), the court of appeals vacated one of the convictions arising from the first incident and held that the two charges were multiplicitous primarily because consecutive sentences such as those imposed for aggravated robbery convictions are mandatory, thus making disproportionate sentencing a distinct possibility. On a second, unrelated issue, the court of appeals held that the admission of out-of-court testimony based upon a photographic array did not violate the defendant's due process right to a fair trial because the array was not impermissibly suggestive.

We now reverse on the issue of the defendant's multiple sentences. We hold that the defendant's judgments of conviction were not multiplicitous because robbery and aggravated robbery are crimes intended to protect persons who control property taken by force and intimidation. Thus, a robber may be convicted of more than one count of robbery by taking commonly-owned property from more than one person. On the issue of the admissibility of out-of-court and in-court identification testimony, we hold that because the differences between the defendant's photograph and others in the array do not relate to a feature witnesses used to identify him, the array was not impermissibly suggestive and the admission of testimony concerning out-of-court identifications did not violate the defendant's right to due process. Hence, on the first issue we reverse the judgment by the court of appeals and return it to that court to address any issues raised by the defendant but not addressed in its opinion. On the second issue, we affirm the judgment of the court of appeals.

## II. Facts and Proceedings Below

Late one evening, two clerks were working at Kitty's Adult Book and Video Store while one customer was present. In preparation for a shift change, both clerks were standing behind the counter and counting the store's money in the single cash register. Then, a man entered the store, started to come be-hind the counter where the two clerks were standing, and said, "O.k. boys, give up your shit now." When the first clerk jumped over the counter to the customer side in an effort to flee, the robber pulled out a hatchet and said he would "axe" the second clerk if the first clerk went anywhere. The first clerk then stopped and stood by as the second clerk gave the robber money from the register. When the second clerk was unable to open the safe, as the robber demanded, the robber repeatedly swung the hatchet into the counter.

When the robber moved away from the counter, the first clerk began to walk towards an exit in the rear of the store. The robber raised the hatchet at him and said "I will axe you, I will follow you." When the robber departed with the money from the register, the first clerk then ran out of the store and called the police. When the police arrived, both clerks and the customer described the robber as a white male, approximately six feet tall, and weighing between 150 and 160 pounds.

Six days later, a strikingly similar robbery occurred at the same bookstore. This time, however, only the second clerk was present. After a brief struggle with the robber, who again carried a hatchet, the clerk gave the robber the money from the cash register. According to the second clerk, the same man committed both robberies.

A year after the robberies, the police summoned the two clerks and the customer to review a photographic lineup of six pictures, one of which was a picture of the defendant. The six pictures all portrayed light-skinned Caucasian males of approximately the same age, weight, and hair coloring. Despite the physical similarities, the defendant's image stood out because his skin tone was significantly lighter, either due to the lighting when the picture was taken or to the overexposure of the film. The other five photographs were similar in terms of lighting, exposure, and skin tone. Additionally, the defendant's picture was distinguishable from the other photo because he was leaning slightly forward with his head tilted, while the others were squarely positioned facing the camera.

Before showing the photographs to the clerks and customer, the officer provided each witness with a photographic lineup admonition, which addressed identification procedures and indicated that the witnesses should ignore any differences in the type or style of the photographs.[1] After reviewing the lineup, the first clerk identified the defendant as the robber, but stated that he was only 70% sure of his identification. The second clerk selected the defendant's picture, but later indicated that he was unsure of his identification. The customer selected two pictures, including the defendant's, that resembled the robber.

The defendant was charged with three counts of aggravated robbery. Two of the three counts arose from the first incident, naming the first clerk as a victim of the robbery and the second clerk as a separate victim of the robbery. The third count arose from the second incident, when only the second clerk was present.

Before trial, the defendant filed a motion to suppress any in-court and out-of-court identifications of the defendant by witnesses on the basis that the photographic lineup was impermissibly suggestive and inherently unreliable. The trial court found that that the officer who showed the witnesses the array took no suggestive measures that induced them to make inappropriate identifications. Despite the difference in appearance of the defendant's photograph, the trial court ruled that the array was not impermissibly suggestive. As a result, all three out-of-court identifications were admitted into evidence at trial.

At trial, the prosecution presented testimony from both clerks. The first clerk made an in-court identification, and stated that he was sure that the defendant was the robber. The second clerk was not asked to, and did not identify the defendant at trial. Instead, his pretrial identification was admitted into evidence, and he testified that he had selected the defendant's photograph because it appeared to be the closest match to the robber. He further testified that although the detective in charge of the lineup did not explicitly tell him who to pick, it was obvious based upon the detective's inflections during the identification procedure and because the defendant's image stood out from the others that the defendant's picture was the one to be chosen. The customer also testified about his pretrial identification of the defendant's picture, and stated that the detective mentioned that a suspect had been apprehended.[2] The defendant's theory of defense was mistaken identity.

A jury convicted the defendant on all three counts of aggravated robbery. The trial court sentenced the defendant to two consecutive ten-year sentences for the counts arising from the first incident and to a concurrent ten-year sentence for the count arising from the second incident.

On appeal, the court of appeals held that the two charges from the first incident containing two counts were multiplicitous, and accordingly vacated the defendant's conviction for the robbery charge that listed the first clerk as the victim of the crime. While the court set forth several factors in considering whether the defendant's convictions were multiplicitous, the court ultimately held that the two charges were unconstitutional "primarily" because consecutive sentences such as those imposed for aggravated robbery convictions are mandatory, thus making disproportionate sentencing a distinct possi-

---

1. The photographic lineup admonition states in part:

   In a moment I am going to show you a group of photographs. This group of photographs may or may not contain a picture of the person who committed the crime now being investigated. The fact that the photos are being shown to you should not cause you to believe or guess that the guilty person has been caught. You do not have to identify anyone. It is just as important to free an innocent person from suspicion as it is to identify those who are guilty ... *[P]ay no attention as whether the photos are in color or black and white or any other difference in the type or style of photographs. You should study only the person in each photograph.* (Emphasis added).

2. The customer's testimony at trial contradicted his testimony at the pretrial hearing, when he stated that the detective in charge of the photo lineup said nothing about the apprehension of a suspect.

bility.[3]  Also central to the court's analysis was its conclusion that robbery is a crime against property, and as a result, when only one taking of property occurs—as in this case, the store's property—there can be only one conviction of robbery.  *Borghesi*, 40 P.3d at 21.  Concerning the testimony of the in-court and out-of-court identifications of the defendant, the court held that the photographic lineup was not impermissibly suggestive because the defendant's distinctive appearance alone did not lead to an identification by witnesses of the defendant as the robber.  Accordingly, admission of testimony about identifications from the lineup did not violate the defendant's right to due process.  *Id.* at 19.

We granted certiorari to review the judgment of the court of appeals on these issues.[4]

## III. Each Victim of a Robbery Forms the Basis of a Separate Charge of Robbery

### A. Introduction

■  The defendant argues that he committed only one aggravated robbery during the first incident because there was only one violent taking of property from a common owner.  Therefore, his conviction of two counts of aggravated robbery is multiplicitous.  In contrast, the prosecution argues that there were two robbery victims because the robber put both in fear of death or bodily injury and both possessed control over the property.  Therefore, the defendant was properly convicted of two counts of aggravated robbery.

■  As background to our discussion, we explain the interplay between our robbery and aggravated robbery statutes.  The elements of the crime of robbery are (1) that the defendant (2) in the State of Colorado (3) knowingly (4) took anything of value (5) from the person or presence of [another victim] (6) by the use of force, threats, or intimidation.  *CJI Criminal* § 15:01 (1983).  Aggravated robbery includes all of the elements of the crime of robbery, but also requires additional elements such as the use of a deadly weapon or putting the person robbed, or any other person, in reasonable fear of death or bodily injury.  *Id.* at 15:06.  Thus, one who commits an aggravated robbery has also committed the lesser included offense of robbery.  *See People v. Futamata*, 140 Colo. 233, 241, 343 P.2d 1058, 1062 (1959) ("If the greater of two offenses includes all the legal and factual elements of the lesser, the greater includes the lesser.").

In light of the related nature of the two offenses, we focus our analysis of whether two robberies can arise out of a single taking of property primarily on the offense of robbery.  However, this analysis will in turn apply to aggravated robbery, for which the defendant was convicted, for two reasons.  First, aggravated robbery differs from simple robbery in the degree of force and violence directed at a victim.  Thus, if we determine that robbery is a crime intended primarily to protect people and charges for robbery are based upon the number of victims, this conclusion will be equally applicable to the potentially more violent crime of aggravated robbery.  Second, because the commission of aggravated robbery includes the lesser crime of robbery, it would be contradictory to apply our conclusion with respect to robbery inconsistently with the greater crime of aggravated robbery.  Similar to the court of appeals' analysis, we consider both the robbery and aggravated robbery statutes together.  *See Borghesi*, 40 P.3d at 21.

3.  Specifically, the court of appeals raised the hypothetical that an armed robber who took an employer's money from one cash register in the presence of fifteen employees could be charged with fifteen counts and sentenced to fifteen consecutive sentences.

4.  We granted the state's petition for certiorari on the following issue:
1.  Whether a robber may be convicted on multiple counts of robbery when he has committed one taking of property from two or more people.

Additionally, we granted the defendant's cross-petition for certiorari on the following issue:
2.  Whether the court of appeals erred in holding that the defendant's due process right to a fair trial was not violated by the admission of testimony concerning an impermissibly suggestive photographic array.

Pursuant to part of the Double Jeopardy Clauses of both the United States and Colorado Constitutions, a person may not be put in jeopardy twice for the same offense. *U.S. Const. amend. V; Colo. Const. art. II, § 18.* In this case the defendant invokes the protection afforded by multiplicity, which occurs when the same offense is charged in multiple counts and results in multiple punishments. *See, e.g., United States v. Morehead,* 959 F.2d 1489, 1505 (10th Cir.1992).

We must determine, therefore, whether the defendant's threatening the two clerks, who were counting their employer's money at the single cash register, constitutes the same offense or multiple offenses under our aggravated robbery statute. Because the legislature establishes and defines offenses and determines "[w]hether a particular course of conduct involves one or more distinct 'offenses,'" we turn to an examination of our robbery and aggravated robbery statutes. *See Sanabria v. United States,* 437 U.S. 54, 70, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978).[5]

In considering our robbery statutes, two possible constructions exist. If we construe the statutes as designed primarily to protect property interests, then only one robbery occurred because there was only one taking of property. In effect, such a construction means that the defendant robbed the store, not the clerks. If, on the other hand, we construe the statutes as designed primarily to protect persons, then there were two robberies because there were two victims during the first incident. That is, the defendant robbed the clerks, not the store.

### B. Plain Language Analysis of the Robbery Statutes

To determine whether our robbery statutes protect persons or property we review how our statutes define a victim. Each robbery statute uses related but differing terms to describe the victim, and ultimately, we conclude that a plain language analysis does not resolve our competing interpretations.

The robbery statute provides that "A person who knowingly takes anything of value from the person or presence of another by the use of force, threats, or intimidation commits robbery." § 18–4–301, 6 C.R.S. (2002). The aggravated robbery statute provides that a person is guilty of aggravated robbery if during the act of robbery he "knowingly wounds or strikes the person robbed or any other person ... [or] knowingly puts the person robbed or any other person in reasonable fear of death or bodily injury ...." § 18–4–302(1)(b).

The phrase "person or presence of another" in the robbery statute refers to the victim of a robbery in the singular, which suggests that the legislature may have intended that a robber commits a separate offense for each person against whom she applies force and intimidation.[6] In contrast, the victim of an aggravated robbery is defined as "the person or any other person." Whether this phrase refers to a single victim or a group of victims appears unclear. One possible reading—that "any other person" means a group of people—suggests that only one conviction based upon an incident involving multiple victims may have been contemplated. On the other hand, another possible reading of "any other person" refers to the victim in the singular, which suggests that similar to the offense of robbery, multiple victims give rise to multiple offenses.

Because aggravated robbery is a heightened form of the lesser included offense of

---

**5.** *Sanabria* refers to the "allowable unit of prosecution," which is the manner in which a defendant's conduct may be divided into discreet acts for the purpose of calculating the number of offenses. 437 U.S. at 69–70, 98 S.Ct. 2170. In this case, we do not find the term "unit of prosecution" helpful, and instead focus on whether our robbery statutes are intended primarily to protect persons or property.

**6.** *See Commonwealth v. Rozplochi,* 385 Pa.Super. 357, 561 A.2d 25, 28–29 (1989) (holding that defendant could be convicted of two robberies for threatening two people during the course of a single theft in part because the state robbery statute "was written with regard to an individual person being placed in danger ... and that a separate offense is committed for each individual person placed in such danger."); *Jordan v. Commonwealth,* 2 Va.App. 590, 347 S.E.2d 152, 155 (1986) ("The statute refers to the victim in the singular and suggests that the General Assembly's primary purpose was the protection of an individual from violence and fear of harm during a robbery.")

robbery, and because the robbery and aggravated robbery statutes address this issue inconsistently, we conclude that the plain language of our robbery statutes does not provide guidance on whether aggravated robbery is a crime against the person or a crime against property. Hence, we shift our inquiry to legislative history of our robbery statutes.

## C. Robbery at Common Law

In 1971, the legislature revised and reenacted the Criminal Code, but the robbery statutes remained essentially the same.[7] Because both the old and the revised robbery statutes track the basic elements of common law robbery, and there is no indication that the legislature has departed from the usual and customary meaning of any of the common law terms, we seek guidance from the common law. *See People v. Jenkins,* 198 Colo. 347, 350, 599 P.2d 912, 913 (1979).

At common law, robbery was (1) the taking, with the intent to steal (2) the personal property of another (3) from his person or in his presence (4) against his will, by violence or intimidation. *See* 4 William Blackstone, *Commentaries on the Laws of England* (1899); 1 Roland Burrows, *Odgers on the Common Law of England,* part IV, ch. V.,(3d Ed.1927). The crime of robbery, which was created before the crime of larceny, developed out of a concern for crimes of violence.[8] Although originally confined to cases of actual violence to the person, robbery eventually extended "not only to cases where property has been taken or delivered under a threat of bodily violence . . . but also where the fear has resulted from apprehension of violence to the habitation and property. . . ." 2 Wayne R. LaFave and Austin W. Scott, Jr., *Substantive Criminal Law* § 8.11, n. 1 (citing *Commissioners on Criminal Law* Fourth Report lxvii (1839)).

As the crime of robbery expanded, so did the criminal law, "by means of the ancient quasi-criminal writ of trespass, to cover all taking of another's property from his possession without his consent, even though no force was used. This misconduct was punished as larceny." American Law Institute, *Model Penal Code* art. 223, Comment 2(a) (1980). Larceny at common law was the willful and wrongful taking possession of and carrying away of another's property without consent and with the intent to deprive the owner of all benefits of ownership. 1 Burrows, *Odgers on the Common Law,* at 338.

Common law robbery, however, is easily distinguishable from the property crime of larceny in two ways. First, there can be no robbery without violence, and there can be no larceny with it. "It is the violence that makes the former an offense of greater atrocity than the latter." 135 A.S.R. 474, 476 (1909). Second, unlike larceny, which required the intent to permanently deprive an owner of property, robbery had no such requirement, and the time of possession could be exceedingly short. As one commentator explained,

> [I]n an old case a thief snatched a lady's earring out of her ear with such violence that he tore her ear; he was immediately arrested and searched, but no earring was found in his possession. When the lady reached her home, she found it in her back hair. This was held to amount to robbery, because the thief had had possession of the earring, although only for a moment.

1 Burrows, *Odgers on the Common Law,* at 390 (citing *Rex v. Farrell,* 1 Leach 322 (1787)).[9]

Modern commentaries on common law robbery also emphasize the assaultive element over the larcenous element of the crime. "Robbery may be considered a greater crime

---

7. Prior to the reenactment in 1971, robbery was "the felonious and violent taking of money, goods or other valuable thing from the person of another by force or intimidation," and aggravated robbery required additional elements such as using a dangerous weapon with the intent to kill or wounding another with a dangerous weapon. §§ 40–5–1(1) and (2), 3 C.R.S. (1963).

8. *See* American Law Institute, *Model Penal Code* art. 223, Comment 2(a)(1980); Wayne R. LaFave & Austin Scott, Jr. *Criminal Law,* 692 n. 1 (1972).

9. For additional commentary on the common law crime of robbery, *see* Edward Coke, *The Third Part of the Institutes of the Laws of England: Concerning High Treason, and Other Pleas of the Crown, and Criminal Causes* 68 (1797).

than the sum of the two lesser crimes of larceny and assault ... The modern trend is to consider robbery as an offense against the person rather than against property...." 2 LaFave & Scott, *Substantive Criminal Law*, at n. 3–4 (citing *Mitchell v. State*, 281 Ark. 112, 661 S.W.2d 390, 391 (1983)). Similarly, another commentator states that the "common law came to regard robbery 'amongst the most heinous felonies.' It was deemed to be a more serious offense than larceny because of the added element of personal violence or intimidation." Rollin M. Perkins & Ronald N. Boyce, *Criminal Law* 344 (3d Ed.1982). Although robbery violates both the interests of personal safety and security as well as the interest in protecting property, "as a matter of abstract classification, it probably should be grouped with offenses against the person rather than with offenses against property...." *Id.* at 350.[10]

Just as the common law of robbery emphasizes the violence associated with the taking, so do our cases construing robbery statutes.[11] We have stated that the gravamen of the offense of robbery is the violent nature of the taking. *People v. Marquez* 692 P.2d 1089, 1097 (Colo.1984), *rejected on other grounds by James v. People*, 727 P.2d 850, 855 n. 4 (1986); *Rowan v. People*, 93 Colo. 473, 475,

---

**10.** For additional commentaries emphasizing the assaultive element of robbery, *see also Model Penal Code* § 222.1 (Official Draft and Revised Comments 1985) ("The primary concern [of robbery] is with the physical danger or threat of danger to the citizen rather than with the property aspects of the crime."); 77 C.J.S. *Robbery* § 2 (2002) ("While it can be characterized as an offense against both person and property, robbery is held to be primarily an offense against the person.") (citing *Degler v. State*, 741 P.2d 659 (Alaska App.1987); *Ross v. Commonwealth*, 710 S.W.2d 229 (Ky.1986), *overruled on other grounds; Winter v. Motel Assoc. of Laguardia*, 127 Misc.2d 486, 486 N.Y.S.2d 656 (N.Y.Sup.Ct. 1985); *Whitley v. Commonwealth*, 223 Va. 66, 286 S.E.2d 162 (1982)); 67 Am.Jur.2d *Robbery* § 22 ("The force or intimidation employed is the essence of the offense."); Joseph T. Bockrath, *Prosecution for Robbery of One Person as a Bar to Subsequent Prosecution for Robbery of Another Person Committed at the Same Time*, 51 A.L.R.3d 693 (1973) ("Ordinarily, where several persons are robbed at the same time, the offender may be indicted and convicted for the robbery of each person as a distinct offense. ...."); United States Department of Justice, Bureau of Justice Statistics, *Recidivism of Prisoners Released in 1994*, available at http://www.ojp.us-doj.gov/bjs/abstract/rpr94.htm (categorizing robbery as a violent offense, along with homicide, kidnapping, rape, and assault as opposed to a property offense with burglary, larceny, theft, arson, and fraud).

**11.** There exists a split of authority among courts in other jurisdictions on this issue. Some have emphasized the assaultive over the larcenous element of robbery and upheld multiple convictions and sentences when the defendant takes commonly-owned property from the presence of more than one person. *See, e.g., Thomas v. Warden*, 683 F.2d 83, 85 (4th Cir.1982); *Ex parte Hawkins*, 6 S.W.3d 554, 560 (Tx.Crim.App.1999); *Commonwealth v. Rozplochi*, 385 Pa.Super. 357, 561 A.2d 25, 30–1 (1989); *Mitchell v. State*, 281 Ark. 112, 661 S.W.2d 390, 392 (1983); *People v.*

*Ramos*, 30 Cal.3d 553, 180 Cal.Rptr. 266, 639 P.2d 908, 928–29 (1982), *rev'd on other grounds*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983); *Commonwealth v. Levia*, 385 Mass. 345, 431 N.E.2d 928, 931 (Ma.1982); *State v. Shoemake*, 228 Kan. 572, 618 P.2d 1201, 1206 (1980). Others have limited criminal liability for multiple counts of robbery under circumstances analogous to this case, based upon the theory that robbery is a crime against property. *See, e.g., United States v. Szentmiklosi*, 55 M.J. 487, 491 (C.A.A.F.2001); *People v. Wakeford*, 418 Mich. 95, 341 N.W.2d 68, 75–6 (1983); *United States v. Canty*, 469 F.2d 114, 126 (D.C.Cir.1972); *State v. Faatea*, 65 Haw. 156, 648 P.2d 197, 198 (1982); *State v. Perkins*, 45 Or.App. 91, 607 P.2d 1202, 1205 (1980); *Rogers v. State*, 272 Ind. 65, 396 N.E.2d 348, 355 (1979); *State v. Whipple*, 156 N.J.Super. 46, 383 A.2d 445, 448 (1978); *State v. Potter*, 285 N.C. 238, 204 S.E.2d 649, 659 (1974).

Because each court's conclusion depends upon its state statute, these cases are generally not instructive in our review of our robbery statutes. However, several cases have analyzed state statutes, such as ours, that are consistent with the common law definition of the crime, and held that multiple charges arise out of a single taking from multiple victims. *See Borchardt v. State*, 367 Md. 91, 786 A.2d 631, 662–65 (2001); *Facon v. State*, 144 Md.App. 1, 796 A.2d 101, 118 (2002); *State v. Jones*, 344 S.C. 48, 543 S.E.2d 541, 543–44 (2001); *Jordan v. Commonwealth*, 2 Va.App. 590, 347 S.E.2d 152, 155 (1986). *See also United States v. Mann*, 119 F.Supp. 406, 407 (D.D.C.1954) ("Although robbery at common law is a species of aggravated larceny, the gist of the offense is a crime against the person, as larceny is an offense against the possession."). *But see State v. Collins*, 174 W.Va. 767, 329 S.E.2d 839, 846 (1984) ("we believe that it is impossible to conclude from either the common law or [the state robbery statute] that an attempt to rob a store by presenting a firearm and leaving without taking any property can ... result in multiple convictions of attempted aggravated robbery for each clerk present in such store.").

26 P.2d 1066, 1067 (1933) ("the gravamen of the offense, as well as the conception of the lawmaking body, rested in the manner of the taking."); *Jenkins,* 198 Colo. at 350, 599 P.2d at 913 ("force or fear is the main element of the offense of robbery"); *People v. Thomas,* 181 Colo. 317, 320, 509 P.2d 592, 594 (1973) ("As we have held in the past, 'force or fear is the main element of the offense [of robbery].'"); *Sterling v. People,* 151 Colo. 127, 130, 376 P.2d 676, 678 (1962) ("The gravamen of [robbery] is the 'manner of the taking.'").[12]

Not only have we emphasized the violent nature of the taking, but we have also de-emphasized the larcenous component of robbery. For example, penalties do not vary based upon the value of the property taken. *See, e.g. Maes v. People,* 178 Colo. 46, 48, 494 P.2d 1290, 1291 (1972). Proof of ownership of the property taken is immaterial so long as the victim had sufficient control over it at the time of the taking. *See, e.g., People v. Bartowsheski,* 661 P.2d 235, 244 (Colo.1983); *Hampton v. People,* 146 Colo. 570, 574, 362 P.2d 864, 867 (1961). Thus, our case precedent reflects the common law emphasis on the assaultive nature of the crime, and indicates that our robbery statutes are primarily intended to protect persons and not property.

**D. Disproportionate Sentencing Concerns and Legislative Designation of Robbery Statutes as "Offenses Against Property"**

The court of appeals based its holding in significant part on the concern that if a de-fendant is convicted and sentenced on multiple counts of aggravated robbery based upon the number of victims in control of the property, disproportionate sentencing may occur. *Borghesi,* 40 P.3d at 21. Pursuant to section 18–1.3–406(1)(a), a court must sentence a defendant to consecutive sentences if he is convicted of two or more separate crimes of violence arising out of the same incident. While this concern for possible disproportionate sentencing is understandable, we reason that it is misplaced in this context.

Considerations of disproportionate sentencing are legally irrelevant to a double jeopardy multiplicity analysis. Once it has been determined that a defendant can be punished for his wrongful conduct, "the manner in which his conduct is divided into separate units for purposes of calculating his total sentence is of no constitutional significance except for deciding whether the total sentence is excessive...." Peter Westen & Richard Drubel, *Toward a General Theory of Double Jeopardy,* 1978 Sup.Ct. Rev. 81, 114.[13] The constitutional determination of whether a sentence is excessive arises not under the Double Jeopardy Clause, but instead, under the Eighth Amendment, which the defendant did not and does not raise in this case.

■ Under the Eighth Amendment, no sentence is per se constitutional. Although courts afford a great deal of deference to legislative determinations regarding sentencing, a defendant is still entitled to an abbrevi-

---

**12.** Arguably, *contra People v. Bartowsheski,* 661 P.2d 235, 244 (Colo.1983) ("The gravamen of robbery is the application of physical force or intimidation against the victim at any time during the course of a transaction culminating in the taking of property from the victim's person or presence."). The defendant argues that based upon *Bartowsheski,* the essence of the crime of robbery is a hybrid of the larcenous and assaultive elements, and the gravamen of the crime is a "violent taking." Because there was only one violent taking in this case, the defendant should be convicted and sentenced for only one count of aggravated robbery. We disagree with this analysis as we set forth in the body of our opinion. In short form, our analysis effectively adds three words to the "violent taking" hybrid—robbery under our statutes involves the violent taking "from a person."

**13.** *See also* Akhil Reed Amar, *Double Jeopardy Law Made Simple,* 106 Yale L.J. 1807, 1818 (1997) ("the Double Jeopardy Clause imposes no limits on how the legislature may carve up conduct into discrete legal offense units."); *Missouri v. Hunter* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535, (1983) ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended."); *Patton v. People,* 35 P.3d 124, 129 (Colo.2001) ("The Double Jeopardy Clauses do not prevent the legislature from specifying multiple punishments based upon the same criminal conduct.").

ated proportionality review upon request for each separate sentence imposed under the crime of violence statute. *Close v. People*, 48 P.3d 528, 540 (Colo.2002); *see also* § 18–1.3–406(2)(a)(I). If an abbreviated proportionality review gives rise to an inference of gross disproportionality, a defendant is then entitled to an extended proportionality review. *Close*, 48 P.3d at 541, *see also People v. Deroulet*, 48 P.3d 520, 527 (Colo.2002).

Additionally, statutory provisions exist to provide courts with sufficient discretion to mitigate disproportionate sentences when appropriate. Pursuant to section 18–1.3–406(1)(a), courts have the discretion to modify sentences for violent crimes in unusual and extenuating circumstances. *See also Borghesi*, 40 P.3d at 25 (Nieto, J., concurring in part and dissenting in part). Although convicted defendants must still serve modified sentences consecutively, courts may modify sentences below the statutory range, even to include probationary sentences, if the defendant is eligible.[14] *Id., People v. Byrum*, 784 P.2d 817, 818 (Colo.App.1989) (holding that evidence of defendant's mental problems, lack of prior convictions, regular medical treatment, and model prison behavior warranted a downward modification of a mandatory sentence).

The defendant argues that the statutory designation of robbery as an offense against property as opposed to an offense against the person indicates the legislature's intent to treat our robbery statutes primarily as protective of property.[15] We are not persuaded.

Such designations are generally left to the revisor of statutes, who possesses no authority to make substantive statutory changes. Hence, we may draw no implications or presumptions of legislative intent. Even if we assume *arguendo* that this designation reflects the will of the General Assembly, we deem it of limited value because the statutes incorporate both larcenous and assaultive elements.

On balance, we reason that the legislative designation of the crime of robbery as an offense against property is less persuasive than the common law principles of robbery upon which our statute is based and our own precedent, both of which emphasize the assault element and deemphasize the theft element. Other jurisdictions support our rationale that the violent nature of the taking merits the treatment of robbery as an offense against the person, even though the crimes are classified under the code heading of offenses against property.[16]

Hence, we conclude that Colorado's robbery statutes are intended primarily to protect persons, not property. Charging, convicting, and sentencing a robber on multiple counts of robbery based upon the number of persons in control of the property taken does not offend multiplicity principles because each person who is subject to force and intimidation constitutes a victim of a separate offense under our robbery statutes. We hold, therefore, that a robber may be convicted of more than one count of robbery for a

---

**14.** In this case, the defendant at sentencing indicated that he had no prior felony convictions, had stability in his life, and had maintained consistent employment for some time. The trial court sentenced the defendant to the statutory minimum of ten years for count one and ten years for count two. On count three, which arose from the second incident when only the second clerk was present, the trial court sentenced the defendant to serve a sentence concurrent with the sentence on counts one and two.

**15.** The robbery statutes are located in Article 4 of the Criminal Code, entitled "Offenses Against Property," instead of in Article 3, entitled "Offenses Against the Person."

**16.** *See State v. Jones*, 344 S.C. 48, 543 S.E.2d 541, 543–44 (2001) (addressing S.C. Stat. § 16–11–330); *Ex Parte Hawkins*, 6 S.W.3d 554, 560

(Tx.Crim.App.1999) (considering Tx. Penal § 29.03); *Commonwealth v. Rozplochi*, 385 Pa.Super. 357, 561 A.2d 25, 28 (1989) (addressing 18 Pa. Stat. Ann. § 3701). *See also People v. Jones*, 217 Ill.App.3d 175, 160 Ill.Dec. 184, 576 N.E.2d 1138, 1138–39 (1991), *rev'd on other grounds* (holding that theft, a crime against property, is not a lesser-included offense of armed robbery, which is a forcible felony carried out against a person or in the presence of a person despite being captioned in the Illinois Revised Statutes as a crime against property.). These cases all held that because robbery protects people, separate victims of an incident involving a single taking create separately chargeable offenses under the same statute.

single taking of property from more than one person.[17]

### E. Application

We begin our application of the principles discussed by initially considering the requirement of robbery that property must be taken from the "victim's person or presence of another." Our case law construes the term "presence of another" to mean that the property taken must be within the victim's reach, inspection or observation so that the victim would be able to retain control over the property but for the force or threat of force directed by the perpetrator against the victim. *See Bartowsheski*, 661 P.2d at 244.

Thus, our holding that the state may charge a defendant with more than one robbery for a single taking from more than one victim is limited by the "presence of another" requirement. Not every person present during a robbery will necessarily give rise to an additional charge. Despite this limitation, the court of appeals' hypothetical of one defendant who robs fifteen clerks appears superficially accurate. An armed robber might be convicted of fifteen counts and sentenced to fifteen consecutive sentences for fifteen crimes. Such a lengthy sentence appears consistent with the purpose expressed by our robbery statutes, but it would occur only when each of the fifteen employees possessed control over the employer's property at the time of the taking, and each of the fifteen were subject to the robber's force or intimidation, and each of the fifteen were put in reasonable fear of death or bodily injury. While possible, this fact situation appears to us to be not very probable.

In this case both clerks, who were counting the money in the cash register, had sufficient control over the store's property when the defendant brandished a hatchet and demanded money from the register. The defendant directed threats to both employees when he sought and obtained control over the store's money. While it was the second clerk who handed over the money, the property was taken from the presence of the first clerk, who would have been able to retain control over it but for the threats by the defendant to the second clerk. Because the common property taken from the second clerk was also taken from the presence of another—the first clerk—the robber's acts constitute different offenses as to each victim under our aggravated robbery statute.

Hence, the judgments of conviction for both clerks are not multiplicitous because the defendant is being punished for two separate offenses, or the robbery of each clerk, and not for the same offense. Accordingly, the trial court's imposition of separate sentences for the first robbery was proper, and we overturn the court of appeals' reversal of the defendant's conviction for one count of aggravated robbery.

### IV. Because the Photographic Array Was Not Impermissibly Suggestive, the Admission of Out–of–Court Identifications Did Not Violate the Defendant's Due Process Rights

A defendant is denied due process when an in-court identification is based upon an out-of-court identification which is so suggestive as to render the in-court identification unreliable. *People v. Mack*, 638 P.2d 257, 265 (Colo.1981). In *Bernal v. People*, 44 P.3d 184, 190–91 (Colo.2002), we outlined a two-part test to determine the admissibility of out-of-court photographic identifications. First, a court must consider whether the defendant has demonstrated that the array was impermissibly suggestive. *Id.* at 191. If the defendant has not met this burden, no further inquiry is necessary. Second, if the defendant has met this burden, then the state must show that the identification was nevertheless reliable under the totality of the circumstances. *Id.* Relevant factors to determine whether a pretrial photographic identification procedure is impermissibly suggestive include "the size of the array, the manner of its presentation by the officers,

---

**17.** Consistent with our holding today, we have previously held that separate victims can form the basis of multiple counts and convictions for the crimes of menacing and reckless endanger-

ment. *People v. Wieckert*, 191 Colo. 511, 514, 554 P.2d 688, 690 (1976), *overruled on other grounds by Villafranca v. People*, 194 Colo. 472, 475, 573 P.2d 540, 543 (1978).

and the details of the photographs themselves." *Id.* (citing *United States v. Wiseman,* 172 F.3d 1196, 1208 (10th Cir.1999)).

With respect to the size of the array, courts have held that a lineup with as few as six pictures is not a per se due process violation, but the fewer the pictures, the closer the array must be scrutinized for impermissibly suggestive irregularities. *See, e.g., United States v. Sanchez,* 24 F.3d 1259, 1262 (10th Cir.1994). If the number of photographs is not so small to make the array impermissibly suggestive, and there is nothing suggestive in the manner of the official's presentation of the array, then the remaining consideration is whether the photographs in the array are so limited that the defendant is the only one to match the witness's description of the perpetrator. *Bernal,* 44 P.3d at 191. To satisfy this consideration, the police need not provide a photo line-up containing only exact replicas of the defendant's picture. Instead, all that is required is that the "photos are matched by race, approximate age, facial hair, and a number of other characteristics." *Id.* at 191–192 (citing *People v. Webster,* 987 P.2d 836, 839 (Colo.App.1998)). However, an array that includes a photograph that contains a unique feature that directly relates to an important identification factor may be impermissibly suggestive. *Id.*

If a court finds that an array is impermissibly suggestive, then it must determine whether, under the totality of the circumstances, the state can demonstrate that the identification was nevertheless reliable. Factors to consider include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and the confrontation. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); *Bernal,* 44 P.3d at 192; *People v. Monroe,* 925 P.2d 767, 771–72 (Colo.1996). Against these factors, courts must weigh the corrupting effect of the suggestive identification. *Manson v.*

*Brathwaite,* 432 U.S. 98, 114, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). As long as the totality of the circumstances does not suggest a very substantial likelihood of misidentification, identification testimony will be admissible. *Id., Simmons v. United States,* 390 U.S. 377, 384, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Bernal,* 44 P.3d at 192.

The defendant argues that the differences in lighting and positioning cause his photograph to stand out from the others, in effect highlighting his picture for selection by witnesses. He contends that identifications of him were so tainted by the suggestive photo array that admission of both the out-of-court and in-court testimony on these identifications violated his right to a fair trial.

Initially we note that our standard of review concerning the constitutionality of pretrial identification procedures is a mixed question of law and fact. *Bernal,* 44 P.3d at 190. While the trial court's findings of fact are entitled to deference, we may afford different weight to those facts and reach a different conclusion in light of the legal standard. *Id.* In this case, we defer to the trial court's findings that the identification procedures were strictly conducted and the presentation of the array to witnesses by the police was not suggestive.

We conclude, consistent with the views of both the trial court and the court of appeals, that the highlighting of the defendant's image under the circumstances of this case did not cause the photo array to be impermissibly suggestive. We base our conclusion on the fact that neither the difference in lighting nor the positioning of the defendant in his photograph is connected to a specific, identifying feature of the defendant raised by any of the witnesses. As we stated in *Bernal,* "a photographic array that includes a photo that is unique in a manner directly related to an important identification factor may be held impermissibly suggestive." 44 P.3d at 192. In *Bernal,* we concluded that the defendant's photograph was impermissibly suggestive primarily because he was the only Hispanic in the array, and both eyewitnesses to the crime identified the robber as Hispanic.[18]

---

18. The defendant's photograph in *Bernal* also

had a clear white background, while the others

*Id.* at 193. Here, because none of the witnesses reviewing the array described the robber with features uniquely highlighted by the defendant's photograph, the array was not impermissibly suggestive.

Other jurisdictions have reached the same results in similar circumstances, holding that differences in shade and tone of a defendant's photograph do not render an array impermissibly suggestive. Particularly persuasive is *United States v. Bubar*, 567 F.2d 192 (2d Cir.1977), in which the defendant argued that the photographic lineup was impermissibly suggestive because, among other things, the focus and contrasts were sharper in his photograph and a narrow strip of light ran across the field above his head. The Second Circuit disagreed, holding that "these differences did not render the spread suggestive . . . much less impermissibly so within the meaning of [the legal standard]." 567 F.2d at 199.[19]

The defendant relies upon the Tenth Circuit case *Wiseman* to challenge our conclusion. We distinguish in part and disagree in part with *Wiseman*. In that case the court concluded that a photographic lineup was impermissibly suggestive primarily because the defendant's picture stood out from the others. The defendant's photograph depicted him with circles under his eyes, with a significantly lighter pallor than the others, and in every picture but the defendant's, a thin necklace was visible around each subject's neck. Witnesses did not use any of these features to identify the defendant. In addition, the court noted that police officers made comments to some of the witnesses viewing the array that a suspect had been arrested, and comments to other witnesses that the perpetrator of the robberies might not be in the array. *Wiseman*, 172 F.3d at 1209–10.

While the facts of *Wiseman* are somewhat analogous to our case in that both defendants' pictures are distinguishable from others presented in the array, the Tenth Circuit's holding is inconsistent with the rationale stated in *Bernal*. As we previously set forth in *Bernal* and in this opinion, an array that includes a photo unique in a manner directly related to an important identification factor may be impermissibly suggestive. However, as long as the photos match by approximate age, race, facial hair, and other characteristics, distinctive features unrelated to a witness's identification do not render an array suggestive. In our view, the officer's comments to witnesses in *Wiseman* that a suspect was in custody, not the way the defendant's photo stood out from the others, are what arguably could cause the array in that case to be impermissibly suggestive. Such is not the case here because the investigating officer presented the photographic lineup admonition to each witness, and at the pretrial suppression hearing, the trial court ruled that the officer made no improperly suggestive overtures.[20]

---

were taken against a neutral background, and there were only six photographs in the array. However, these factors only compounded the most compelling deficiency of the array—the defendant's ethnicity—which was the unique identifying feature raised by both witnesses shortly after the crime occurred.

19. *See also State v. Hunter*, 43 S.W.3d 336, 341 (Mo.App.2001); *Brewer v. State*, 219 Ga.App. 16, 463 S.E.2d 906, 911 (1995); *Shaw v. State*, 846 S.W.2d 482, 484 (Tx.App.1993); *People v. Johnson*, 3 Cal.4th 1183, 14 Cal.Rptr.2d 702, 842 P.2d 1, 17 (1992); *People v. Robert*, 184 A.D.2d 597, 585 N.Y.S.2d 445, 446 (1992); *State v. Neal*, 353 N.W.2d 83, 89 (Iowa 1984).

20. The second clerk and the customer testified differently at trial than they did during the pretrial suppression hearing on the issue of whether the detective made suggestive comments before displaying the photo array. The second clerk testified at trial that the detective had inflected his voice in such a way that suggested the clerk should pick the defendant's photograph. He testified to the contrary at the suppression hearing that neither the detective's lineup admonition nor the array itself was suggestive. The customer, present during the first incident, testified at trial that before viewing the array, the detective explained that a suspect had been apprehended. As was the case with the second clerk, the customer testified to the contrary at the pretrial hearing. He testified that the officer made neither suggestive comments about the status of the investigation nor the apprehension of a suspect.

We review the defendant's argument concerning the admissibility of the out-of-court photo identifications by considering only the evidence presented at the pretrial hearing. Thus, we express no opinion concerning whether the trial court would have made the same finding of fact at the hearing had the second clerk and customer

Having held that the array was not impermissibly suggestive, we need not reach the second prong of the test set forth in *Bernal.* Therefore, we affirm the judgment of the court of appeals on this issue.

## V. Conclusion

For the reasons stated, we reverse the judgment of the court of appeals on the issue of the defendant's multiple counts and convictions arising from a single incident, and affirm the judgment of the court of appeals on the issue of the photographic lineup. We therefore return this case to the court of appeals to address any issues raised by the defendant on appeal not addressed by that court in its opinion.

Justice RICE and Justice COATS do not participate.

testified in the same way that they did at trial. Of course, the defendant could use both the second clerk's and the customer's trial testimony to support his theory of mistaken identity.