The PEOPLE of the State of Colorado,
Plaintiff–Appellee and Cross–
Appellant,

v.

Bruce Norman ROBB, Defendant–
Appellant and Cross–Appellee.

Nos. 04CA2569, 05CA1327.

Colorado Court of Appeals,
Div. III.

April 16, 2009.

Rehearing Denied June 4, 2009.

§ 24–51–1105, C.R.S.2008.

John W. Suthers, Attorney General, Alexander C. Reinhardt, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee and Cross–Appellant.

Thomas K. Carberry, Denver, Colorado, for Defendant–Appellant and Cross–Appellee.

Opinion by Judge LOEB.

Defendant, Bruce Norman Robb, appeals the judgment of conviction entered on jury verdicts finding him guilty of one count of securities fraud and one count of computer crime. The People cross-appeal certain aspects of the trial court's restitution order.

We affirm Robb's conviction for securities fraud, reverse Robb's conviction for computer crime, and vacate his sentence on that count; and we affirm the restitution order in part, reverse it in part, and remand to the trial court to modify part of that order.

### Direct Appeal

#### I. Background and Procedural History

Robb was a salesperson for Kidztime TV Inc. and its holding company and affiliate, Capital Funding Financial Group, located in Colorado.

Kidztime was created by owners and associates of an affiliate of the Children's Cable Network (CCN). Kidztime was intended to provide nonviolent television programming for children. This programming was to air on various cable stations in different geographical locales throughout the United States. Each Kidztime franchise was set up as an independent partnership.

Capital Funding paid sales commissions to its independent sales offices for selling general partnership interests in Kidztime and CCN. The independent sales offices would contact Capital Funding with sales leads for potential investors. Prospective partners were then provided with a sales brochure that included information about the partnership and with a partnership agreement. The brochure was known as the "green brochure." Computers were used as part of this process, including generating copies of the green brochure that were sent to potential investors. A typical investment was $10,000 for one partnership unit of one affiliate of Kidztime. A typical affiliate would raise somewhere between $500,000 and $750,000 through such sales of partnership interests.

Scott Severson and Ken King were responsible for incorporating Capital Funding. Beginning in 1995, Robb worked for Severson and King as one of Capital Funding's first commissioned salespersons. Robb left his position to pursue another job opportunity for a short period, but was asked to return as a salesperson for Kidztime, which he did. Shortly thereafter, Robb was offered his own independent sales office in Colorado, but he declined and instead became a lead salesperson at an independent sales office in Colorado, where he supervised a team responsible for sales of partnership interests. There was some dispute at trial about whether this Colorado office was actually Robb's own independent sales office. However, Robb testified he was a salesperson, not an owner of the independent sales office.

In Robb's role as salesperson, he contacted people to tell them about investment opportunities with Kidztime. Robb followed the same script all the salespeople used when giving his sales pitch. If he found an interested prospective investor, that person's name was given to a staff member at Capital Funding, who would then send out a copy of the green brochure to the potential investor. Robb received at least a fifteen percent commission for the units he succeeded in selling, including two units he sold to a family by the name of Meister and one to an individual by the name of Hoges.

The premise of the business model for Kidztime was that local affiliates would generate revenue through advertising, which would fund the ongoing costs of the programming and leasing access to the programming. Under the terms of the partnership agreement, approximately eighty-five percent of the money raised was dedicated to fundraising expenses and the costs of acquiring the programming. The remaining fifteen percent would serve as working capital for the affiliate. However, very few advertisements were sold. Because of this, the affiliates quickly ran out of money and could not continue to pay the leased access costs. After the advertising plan failed, the owners and operators of the organization attempted to conduct event-based marketing by sponsoring reading programs and then holding awards ceremonies in the hope that advertisers would pay to sponsor such an event. However, very little money was generated from the event-based marketing, and the affiliates ran out of money.

In 2001, a state-wide grand jury charged fourteen codefendants, including Robb, in an eighty-five-count indictment relating to the fraudulent sale of partnership interests during the period 1995–1998. Robb was charged with computer crime, transacting business as a sales representative without a license, employment of unlicensed sales representatives, conspiracy to commit securities fraud, three counts of securities fraud, and a violation of the Colorado Organized Crime Control Act.

Nine of the fourteen codefendants entered into plea agreements prior to trial. Robb pleaded not guilty, and he and the remaining codefendants were tried together in 2004.

At trial, an expert in federal and state securities law testified generally regarding the definition of a security and opined that a Kidztime partnership was a security, subject to securities regulations. Moreover, the expert testified that the "Risk Disclosure Statement" in the green brochure was misleading regarding whether Kidztime was subject to regulation, particularly because cease and desist orders enjoining the sale of Kidztime units had been issued in several other states. He further testified that certain financial projections in the brochure were misleading.

Before the case was submitted to the jury, the trial court granted Robb's motion for judgment of acquittal on a charge of securities fraud related to the sale of a partnership unit to Hoges. The jury convicted Robb of one count of securities fraud—course of business and one count of computer crime. The jury acquitted Robb of the remaining counts, including a count of securities fraud related specifically to the sale of two partnership units to the Meisters. Robb was sentenced to eight years probation on each of the two counts on which he was convicted, and six months work release and a ninety-day suspended sentence on the securities fraud count. The court also ordered Robb to pay $20,000 in restitution. This appeal and cross-appeal followed.

## II. Sufficiency of the Evidence— Securities Fraud

Robb contends there was insufficient evidence to convict him of securities fraud— course of business. We disagree.

Robb filed a mid-trial motion for judgment of acquittal and also a post-trial motion for judgment of acquittal, or in the alternative, for a new trial, based on insufficient evidence of securities fraud. The trial court denied Robb's motions.

We review a sufficiency of the evidence claim de novo. *See Dempsey v. People,* 117 P.3d 800, 807 (Colo.2005); *People v. Cook,* 197 P.3d 269, 279 (Colo.App.2008).

■ "When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt." *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999).

■ When ruling on a motion for judgment of acquittal, the trial court must consider both the prosecution and the defense evidence. *Id.* at 778. Considering all the evidence, the trial court must determine whether, when viewed as a whole and in the light most favorable to the prosecution, that evidence is substantial and sufficient to support a conclusion by a reasonable person that the defendant is guilty of the crime beyond a reasonable doubt. *See People v. Ramirez,* 30 P.3d 807, 808 (Colo.App.2001); *see also Dempsey,* 117 P.3d at 807; *Taylor v. People,* 723 P.2d 131, 134 (Colo.1986). However, the determination of the credibility of witnesses is solely within the province of the jury. *Sprouse,* 983 P.2d at 778. Moreover, the jury must determine what specific weight should be accorded to various pieces of evidence and resolve conflicts in the evidence. *Id.; see also Ramirez,* 30 P.3d at 808. The court may not serve as a thirteenth juror. *Sprouse,* 983 P.2d at 778.

Here, the jury found Robb guilty of securities fraud—course of business, pursuant to section 11–51–501(1)(c), C.R.S.2008. The elemental jury instruction on this charge tracked the language of the statute and provided that the elements of securities fraud in the course of business are:

(1) That the defendant,

(2) in the state of Colorado, at or about the date and place charged,

(3) in connection with the offer, sale or purchase of any security,

(4) directly or indirectly,

(5) willfully,

(6) engaged in any act, practice or course of business, which operated as fraud or deceit upon any person.

■ Considering the evidence as a whole, and viewing it in the light most favorable to the prosecution, we conclude there was sufficient evidence to convict Robb of securities fraud in the course of business.

First, there was evidence, albeit somewhat conflicting, that Robb knew that cease and desist orders prohibited the sale of Kidztime units in various other states. In addition, there was also evidence presented, albeit again conflicting, from which a jury could conclude Robb was culpable for misrepresentations in the green brochure. Further, the evidence showed that Robb directly sold Kidztime units, and the jury found such units to be "securities." For example, Robb was the first salesperson for Severson and King at Capital Funding. Robb also testified he

later became a lead salesman at an independent sales office and solicited and received commissions on the sale of numerous Kidztime units to investors in Colorado. It was as a salesman that he found people interested in the venture, who, as a result, were sent copies of green brochures. Further, evidence was presented by an expert witness that the green brochure was misleading and contained misrepresentations and that the partnership was subject to regulations under the applicable securities laws.

■ We are not persuaded by Robb's contention that there was insufficient evidence because he was acquitted on other counts of securities fraud specifically based on sales to the Meisters and Hoges.

First, to the extent Robb is contending the verdicts are inconsistent, that would provide no basis for reversal of the conviction for securities fraud—course of conduct. *See People v. Frye*, 898 P.2d 559, 570 (Colo.1995)(consistency among verdicts is unnecessary where a defendant is convicted on one or more counts but acquitted on others); *see also United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984) (sufficiency of the evidence review of a guilty verdict is independent of jury's determination that evidence on another count was insufficient).

Moreover, the verdicts here are not inconsistent. The Meister and Hoges counts arose under section 11–51–501(1)(b), C.R.S. 2008. That statute provides:

> (1) It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly: ...
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading. ...

In contrast, securities fraud in the course of business, pursuant to section 11–51–501(1)(c), the count at issue here, contains different elements from the securities fraud counts on which Robb was acquitted. Thus, it was entirely possible for Robb to be acquitted of the counts of securities fraud under section 11–51–501(1)(b) because the jury found he did not make any untrue statement of material fact or omit to state a material fact to the Meisters, and be convicted on the count of securities fraud in the course of business under section 11–51–501(1)(c) because the jury found he willfully engaged, directly or indirectly, in any course of business that operated as a fraud or deceit upon any person.

Accordingly, we conclude there was sufficient evidence for a jury to conclude that Robb committed securities fraud in the course of business and, thus, we further conclude the trial court did not err in denying Robb's motions for judgment of acquittal and for a new trial.

### III. Computer Crime

Robb contends that there was insufficient evidence to convict him of computer crime. We agree.

#### A. Sufficiency of the Evidence

■ Specifically, Robb contends the evidence was insufficient to establish that he "used" a computer or computer system or network as the term "use" is defined in the applicable version of Colorado's computer crime statute in effect at the times pertinent to this case.

Robb raised this contention in both midtrial and post-trial motions for judgment of acquittal and thus preserved this issue for appellate review. Accordingly, we apply the same standard of review as we did with respect to the securities fraud conviction discussed above. *See generally Sprouse*, 983 P.2d at 777–78; *Ramirez*, 30 P.3d at 808.

The computer crime count in the indictment charged that the crime was committed between 1995 and 1998. Accordingly, we look to the version of Colorado's computer crime statute in effect during that time. Ch. 202, secs. 2 & 3, §§ 18–5.5–101 & –102, 1983 Colo. Sess. Laws 705–06.

The prosecution charged Robb with computer crime pursuant to section 18–5.5–102(1), which provided as follows:

> Any person who knowingly uses any computer, computer system, computer net-

work, or any part thereof for the purpose of devising or executing any scheme or artifice to defraud; obtaining money, property, or services by means of false or fraudulent pretenses, representations, or promises; using the property or services of another without authorization; or committing theft commits computer crime.

The term "to use" was defined in section 18–5.5–101(10), as "to instruct, communicate with, store data in, retrieve data from, or otherwise make use of any resources of a computer, computer system, or computer network."

■■■ Statutory interpretation is a question of law we review de novo. *People v. Rice,* 198 P.3d 1241, 1244 (Colo.App.2008). Our primary purpose in construing a statute is to ascertain and give effect to the intent of the General Assembly. *Id.* When construing a statute, we look first to the language of the statute itself, giving words and phrases their plain and ordinary meaning. *Id.* However, where, as here, the General Assembly has defined a statutory term, a court must apply that definition. *People v. Swain,* 959 P.2d 426, 429–30 (Colo.1998).

The evidence of Robb's use of a computer is sparse and shows that his interaction with computers at Capital Funding and Kidztime was remote and attenuated at best. Robb testified on direct examination that he was computer illiterate and did not even have a computer in his office, with the exception of a short period of time before a computer left behind by the last person using the office was removed. He further testified that he did not use that computer and, indeed, never even turned it on. On cross-examination, the prosecution did not ask Robb any questions about computer use. Nor have the People pointed us to any other evidence in the record (including documentary evidence such as emails) indicating that Robb used a computer or even directed the use of a computer, as defined in the statute.

Indeed, the People's theory on appeal, as it was at trial, appears to be that evidence that other personnel in the organization actually used computers was sufficient evidence to convict Robb of computer crime, given his role as a salesperson. Thus, the record reflects that when Robb, in his role as a salesman, identified potential investors interested in purchasing a Kidztime unit, he gave those names to other staff members at Capital Funding. However, there is no evidence that Robb used a computer to do so. A staff person then sent the potential investors materials about Kidztime, including the green brochure, which were apparently generated by a computer. However, according to King's testimony, Robb and the other salespeople were not involved in generating those materials or sending them out to investors. We also find it instructive that the computer crime charge here against Robb was not prosecuted on a complicity theory (nor was the jury so instructed). Thus, the People were required to prove beyond a reasonable doubt that he personally "used" a computer as that term is defined in the statute, rather than that he simply aided and abetted others who may have actually used a computer in the sales process.

Even viewing the evidence in the light most favorable to the prosecution, *Sprouse,* 983 P.2d at 777, on the record here, we conclude Robb did not "use" a computer or computer system or network within the meaning of the statute. In reaching that conclusion, we find *People v. Rice,* decided by another division of this court, and *People v. Jemison,* 187 Mich.App. 90, 466 N.W.2d 378 (1991), instructive.

In *Rice,* the defendant fraudulently claimed unemployment benefits through a computer phone system. *Rice,* 198 P.3d at 1243. When the computer system asked the defendant whether she was still employed, she punched the number for "no," although she was in fact employed. *Id.* A division of this court interpreted the current version of the computer crime statute, section 18–5.5–102, C.R.S.2008, which replaced the word "use" with the word "access" as the operative verb in the sections describing the elements of the crime. *Id.* The current statute does not define "access." Therefore, the division in *Rice* considered the plain and ordinary meaning of the term and applied the dictionary definition of "access": "[a]n opportunity or ability to enter, approach, pass to and from, or communicate with." *Id.* at 1244

(citing *Black's Law Dictionary* 14 (8th ed.2004) ). Significantly, the division explicitly rejected the defendant's narrow interpretation of the word "access" and found that providing fraudulent information directly to a computer system over the phone was sufficient to constitute "access" under the statute. *Id.* In so holding, the division distinguished two non-Colorado cases where other courts held the defendant did not "access a computer," because the defendants in those cases only communicated with another person, who then directly accessed a computer system. *Id.; see State v. Rowell,* 121 N.M. 111, 908 P.2d 1379, 1381–83 (1995)(defendant did not "access" computer within statutory definition by communicating with actual persons through long distance phone system maintained by computers); *Jemison,* 466 N.W.2d at 380.

In *Jemison,* the defendant used her position in the Michigan Department of Social Services to open files for fictitious people in order to collect welfare checks and food stamps. *Jemison,* 466 N.W.2d at 379. The Michigan computer crime statute also employs the word "access" as the operative verb in the statutory section setting forth the elements of the crime. *Id.* at 380. Moreover, the Michigan statute defines the term "access" similarly to the Colorado statute's definition of the term "use": " 'Access' means to approach, instruct, communicate with, store data in, retrieve [or intercept] data from, or otherwise use the resources of, a computer, computer system, or computer network." *Id.* (quoting Mich. Comp. Laws § 752.792(2)(1) ).

In *Jemison,* the evidence at trial showed that the defendant completed paper documentation by hand containing fraudulent information and submitted it to her supervisor, who then gave the paperwork to a computer operator, who in turn fed the information into the Department's computer system. This caused the fictitious files to be opened, and welfare checks and food stamps to be issued. *Id.* As is the case here, there was no evidence in *Jemison* that the defendant actually used or accessed a computer.

The court in *Jemison* held that the defendant's conduct did not fall "within the pur-

view of the computer fraud statute." *Id.* In language that we find particularly persuasive here, the court stated:

> To "cause access to be made" to a computer requires more than merely supplying information which ultimately finds its way into a computer system in the normal course of business. We do not believe, on the basis of the language of the statute, that the provision is all encompassing. The computer must serve as the device by which the fraud is perpetrated, *and the defendant must participate in the access of the computer as that term is defined by the statute.* Here, the computer merely played an incidental role in processing [Department] paperwork.

*Id.* (emphasis added).

Based on the reasoning of *Rice* and *Jemison,* we discern the term "access" is at least as broad as the term "use" in the applicable statute here. Indeed, the statutory definition of "access" addressed in *Jemison* was essentially the same as the statutory definition of "use" in the Colorado statute. Thus, the division in *Rice* concluded that the evidence was sufficient to prove "access" under the computer crime statute because the defendant there provided "fraudulent information directly to a computer system, rather than an actual person." *Rice,* 198 P.3d at 1244 (expressly distinguishing *Jemison* on that basis).

By contrast, we conclude the evidence here was not sufficient to prove use of a computer, where Robb simply provided information about prospective investors to another person, who then sent out computer-generated materials to those prospects. Further, King testified that the staff members responsible for sending out the materials to potential investors marked the initials of the salesperson making the request on those materials without the salesperson ever seeing the materials. Nor are we persuaded by the People's argument that the use of computers by other personnel at Capital Funding to generate other documents (such as commission checks and certificates of ownership) somehow implicated Robb in the commission of computer crime, particularly where the

charge was not prosecuted on a complicity theory.

Accordingly, we conclude there was insufficient evidence that Robb used a computer or computer system or network, as required by the applicable computer crime statute, and that his conviction on that count must be reversed.

### B. Other Contentions

Because of our resolution of this issue, we need not address Robb's remaining contentions regarding the computer crime conviction, including his contention that there was insufficient evidence of value and his arguments attacking the constitutionality of the statute.

### IV. Application of *Feigin*

■ Robb contends the trial court violated his right to due process by retroactively applying an unforeseeable interpretation of the securities law, as articulated by a division of this court in *Feigin v. Digital Interactive Associates, Inc.,* 987 P.2d 876 (Colo.App. 1999). We disagree.

■ "[A] state court's retroactive application of an unforeseeable interpretation of state law may deprive a criminal defendant of due process." *Hawkins v. Mullin,* 291 F.3d 658, 663 (10th Cir.2002). Whether the application of an interpretation of state law violates due process depends on whether the decision was sufficiently foreseeable, so that the defendant had fair warning that the interpretation given to the relevant statute by the court would be applied in his or her case. *Aue v. Diesslin,* 798 P.2d 436, 441 (Colo.1990). The application of a statute is not foreseeable if (1) the statute is narrow and precise and (2) the judicial construction of the statute is unexpected and indefensible. *Hawkins,* 291 F.3d at 664–65.

This issue was raised in the trial court by a motion of one of Robb's codefendants, in which all the defendants, including Robb, joined. Thus, the issue was preserved, and we review for harmless error. *People v. Cohn,* 160 P.3d 336, 344 (Colo.App.2007).

In *Feigin,* the division addressed the issue of what test should be applied to determine whether a general partnership interest is a security for purposes of the Colorado Securities Act. 987 P.2d at 881.

The division in *Feigin* chose to follow the test articulated in *Williamson v. Tucker,* 645 F.2d 404 (5th Cir.1981), which the division described as the "generally recognized leading case on this question." *Feigin,* 987 P.2d at 881. In *Williamson,* the court held that the determination as to whether a general partnership is a security is to "be made on the basis of substance, or economic reality, not form." *Feigin,* 987 P.2d at 881. The *Feigin* division declined to follow the minority view, as articulated in two Tenth Circuit cases, *Banghart v. Hollywood General Partnership,* 902 F.2d 805 (10th Cir.1990), and *Maritan v. Birmingham Properties,* 875 F.2d 1451 (10th Cir.1989), which focused the test on whether management powers were reserved in the partnership agreement, not the economic reality of whether general partners actually exercised these powers. *See Banghart,* 902 F.2d at 808. Indeed, the division in *Feigin* expressly noted that the *Banghart* court itself recognized *Williamson* as "the leading case," but felt constrained to follow the minority view previously expressed in *Maritan. Feigin,* 987 P.2d at 881.

Robb contends it was not foreseeable that the division in *Feigin* would follow *Williamson* rather than the Tenth Circuit precedent in *Banghart* and *Maritan.* We are not persuaded for two reasons.

First, we reject Robb's argument that Colorado's securities fraud statutory scheme is narrow and precise. Rather, Colorado courts have repeatedly stated the law is broad and should be applied liberally to conform to economic realities. *See People v. Milne,* 690 P.2d 829, 833 (Colo.1984)("[T]he broad scope of the statutory definition evinces 'a legislative intent to provide the flexibility needed to regulate the various schemes devised by those who seek to use the money of others with the lure of profits.' " (quoting *Lowery v. Ford Hill Inv. Co.,* 192 Colo. 125, 130, 556 P.2d 1201, 1205 (1976)) ); *Sauer v. Hays,* 36 Colo.App. 190, 198, 539 P.2d 1343, 1348 (1975) ("It is the substance of this scheme upon which we

must focus and not its form. 'Substance is exalted over form and emphasis is placed on economic reality.'" (citation omitted) (quoting *Vincent v. Moench,* 473 F.2d 430, 435 (10th Cir.1973)) ); *Joseph v. Viatica Mgmt., LLC,* 55 P.3d 264, 266 (Colo.App.2002)("Whether a particular transaction involves a security depends not on the name or the form of the instrument, but on the substantive economic realities underlying the transaction."); *Griffin v. Jackson,* 759 P.2d 839, 842 (Colo.App.1988)("The statutory definition of a 'security' is intended to provide the flexibility needed to regulate various schemes devised by those who seek the use of money of others with the lure of profits. Because the Securities Act is remedial in purpose and designed to protect the public from speculative or fraudulent schemes, we apply a broad definition to the term 'security.'" (citation omitted) ).

Second, we do not perceive that the division's application of the law in *Feigin* was either unexpected or indefensible. In *Feigin,* the division acknowledged there were two lines of authority on how to determine whether interests in a partnership or joint venture were a security, and therefore, subject to regulation under the securities law. *Feigin,* 987 P.2d at 881. The division expressly determined that *Williamson* reflected the majority view and was the recognized leading case on the issue. *Id.* Therefore, the division declined to adopt the minority view, as expressed in *Banghart,* stating "the minority view ... in our view, is not the better reasoned view." *Id.*

We conclude it was neither unexpected nor indefensible for the division in *Feigin* to follow the majority view articulated in *Williamson.* This is particularly true in light of the absence of any prior Colorado appellate decision adopting the contrary view. Therefore, we further conclude the result in *Feigin* was foreseeable and, consequently, its application to this case did not violate Robb's right to due process.

### V. Reasonable Doubt Instruction

 We reject Robb's contention that the trial court's instruction on "reasonable doubt" violated his due process rights.

The trial court instructed the jury, as provided in CJI–Crim. 3:04:

> The burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged.
>
> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.
>
> If you find from the evidence that each and every element has been proven beyond a reasonable doubt, you will find the defendant guilty. If you find from the evidence that the prosecution has failed to prove any one or more of the elements beyond a reasonable doubt you will find the defendant not guilty.

Robb contends that this instruction is unconstitutional because it does not properly define reasonable doubt. We disagree.

 "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof. Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Victor v. Nebraska,* 511 U.S. 1, 5, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) (citations omitted; quoting *Holland v. United States,* 348 U.S. 121, 140, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954)).

 Contrary to Robb's assertions:

- informing the jury that reasonable doubt "arise[s] from ... the evidence, or lack of evidence," does not undermine the presumption of innocence, *see Conner v. State,* 711 N.E.2d 1238, 1246–47 (Ind. 1999); *see also Johnson v. Louisiana,* 406 U.S. 356, 360–61, 92 S.Ct. 1620, 1624, 32 L.Ed.2d 152 (1972) ("Numerous cases

have defined a reasonable doubt as one 'based on reason which arises from the evidence or lack of evidence.'" (quoting *United States v. Johnson*, 343 F.2d 5, 6 n. 1 (2d Cir.1965)) ).

- a reasonable doubt instruction need not be phrased in terms of proof of "utmost certainty," *see, e.g., State v. Butler*, 207 Conn. 619, 543 A.2d 270, 278 (Conn.1988); *Christmas v. State*, 700 So.2d 262, 269–70 (Miss.1997), or of proof excluding every reasonable hypothesis of innocence, *see, e.g., Holland*, 348 U.S. at 139–40, 75 S.Ct. at 137–38; *United States v. Williams*, 264 F.3d 561, 578 n. 11 (5th Cir.2001); *State v. Smith*, 37 Conn.Supp. 664, 434 A.2d 368, 369–70 (Conn.Super.Ct.1981).

- stating the reasonable doubt standard in terms of "a doubt that would cause a reasonable person to hesitate to act" is a "formulation [of which the United States Supreme Court] ha[s] repeatedly approved." *Victor*, 511 U.S. at 20–21, 114 S.Ct. at 1250; *see also Holland*, 348 U.S. at 140, 75 S.Ct. at 138 ("We think this section of the [reasonable doubt] charge should have been in terms of the kind of doubt that would make a person hesitate to act, rather than the kind on which he would be willing to act." (citation omitted) ).

While other definitions of reasonable doubt could be consistent with the requirements of due process, Colorado's definition is not inconsistent with such requirements. *See People v. Rubio*, —— P.3d ——, 2009 WL 1013037 (Colo.App. No. 06CA2014, Apr. 16, 2009).

Accordingly, we conclude the trial court did not err by instructing the jury on reasonable doubt as set forth in CJI–Crim. 3:04.

### VI. Summary

The conviction for computer crime is reversed, and the sentence on that count is vacated. In all other respects, the judgment of conviction is affirmed.

### Cross–Appeal

On cross-appeal, the People contend that the trial court erred (1) in the amount of restitution ordered, (2) by not ordering that the defendants were jointly and severally liable for restitution, and (3) by placing the collection of restitution in the Attorney General's office. We disagree with the first two contentions, but agree that the collection of restitution did not belong in the Attorney General's office.

 Initially, we reject Robb's argument that the doctrine of issue preclusion bars the People from relitigating the restitution issue here, because a division of this court previously decided the identical issues in the appeal of one of Robb's codefendants. *See People v. French*, 2008 WL 3822601 (Colo. App. Nos. 04CA2383 & 05CA1328, Aug. 14, 2008)(not published pursuant to C.A.R. 35(f) ).

Because a petition for certiorari and a cross-petition by the People are pending in that appeal, mandate has not issued, and there is no final judgment on the merits. Accordingly, the doctrine of issue preclusion is not applicable here. *See Rantz v. Kaufman*, 109 P.3d 132, 141 (Colo.2005) (for the purposes of issue preclusion, a judgment that is still pending on appeal is not final); *Marinez v. Indus. Comm'n*, 746 P.2d 552, 558 n. 6 (Colo.1987) (court of appeals judgments that are under review by certiorari are not final); *People v. McAfee*, 160 P.3d 277, 281 (Colo. App.2007) ("A final case means 'a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied.'" (quoting *Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 712, 93 L.Ed.2d 649 (1987)) ).

Thus, we address the People's contentions regarding restitution on their merits.

### I. Restitution Amount

 The People contend the trial court abused its discretion when it ordered that Robb pay restitution in the amount of $20,000, as opposed to $1,174,612, the full unpaid balance of all losses sustained by every Colorado victim in this case. We disagree.

■ A trial court has broad discretion in determining the appropriate terms and conditions of restitution orders, and absent a gross abuse of discretion, the trial court's ruling will not be disturbed on appeal. *People v. Smith*, 181 P.3d 324, 325 (Colo.App. 2007).

A trial court's decision fixing the amount of restitution will not be disturbed if it is supported by the record. *People v. Rivera*, 968 P.2d 1061, 1068 (Colo.App.1997).

Section 18–1.3–205, C.R.S.2008, provides that the trial court is required, as a condition of every sentence to probation, to order the defendant to "make full restitution."

"Restitution," as defined in section 18–1.3–602(3)(a), C.R.S.2008, is "any pecuniary loss suffered by a victim … [that is] proximately caused by an offender's conduct and that can be reasonably calculated and recompensed in money." The term "victim" is defined in section 18–1.3–602(4)(a), C.R.S.2008, as "any person aggrieved by the conduct of an offender."

■ Section 18–1.3–205 requires trial courts to impose mandatory restitution payments for the benefit of the party immediately and directly aggrieved by a defendant who is convicted of a criminal act. *People v. Borquez*, 814 P.2d 382, 384 (Colo.1991). Such payments are based on the actual, pecuniary damages sustained by the victim. *Id.* " 'Payment of restitution is authorized only as to the victim of a defendant's conduct, and only for the actual pecuniary damage the victim sustained as the direct result of the defendant's conduct.' " *Id.* (quoting *People v. Deadmond*, 683 P.2d 763, 774 (Colo.1984)).

The evidence presented at trial established that there were Colorado victims who invested in Kidztime without utilizing Robb as their salesperson and, indeed, without Robb's involvement at all.

Accordingly, we conclude that the trial court did not err by ordering that Robb pay restitution of $20,000, based on specified victims (the Meisters) who were affected by Robb's actions in association with Kidztime and Capital Funding.

## II. Joint and Several Liability

■ The People also contend that the trial court erred by failing to order Robb and codefendants Scott French and Wesley Nelson to be jointly and severally liable for the entire restitution amount ordered by the court. We disagree.

Section 18–1.3–603(5), C.R.S.2008, states: "If more than one defendant owes restitution to the *same* victim for the same pecuniary loss, the orders for restitution shall be joint and several obligations of the defendants." (Emphasis supplied.)

Here, the trial court directed Robb and his codefendants to pay restitution to different victims. These obligations did not overlap among victims. Accordingly, the trial court did not err by ruling that the defendants were not jointly and severally liable.

## III. Collection of Restitution

■ Finally, the People contend the trial court erred by ordering that the court's clerk forward all restitution amounts to the Attorney General's office "who will be responsible for apportioning said restitution monies among the victims." Robb concedes this point and we agree.

Section 18–1.3–602(1), C.R.S.2008, defines a "collections investigator," or a person who collects court-ordered restitution from defendants, as

a person employed by the judicial department whose primary responsibility is to administer, enforce, and collect on court orders or judgments entered with respect to fines, fees, restitution, or any other accounts receivable of the court, judicial district, or judicial department.

*See also* §§ 16–18.5–104,–105, C.R.S.2008 (initial collections investigation and monitoring).

The Attorney General's Office is not part of the judicial department. *Compare* Colo. Const. art. IV, § 1 (attorney general is a member of the executive department), *with* Colo. Const. art. VI, § 1 (vestment of judicial power). Thus, the trial court erred by requiring the office of the Attorney General to assume the duties of an employee of the judicial department. *See* Colo. Const. art.

III ("[N]o person . . . charged with the exercise of powers properly belonging to one of these departments shall exercise any power properly belonging to either of the others . . . .").

We therefore reverse that part of the trial court's order requiring the Attorney General to bear the responsibility of distributing the restitution monies among the victims, and remand to the trial court to require the collections investigator and the court's clerk to perform this task.

The judgment of conviction on the charge of computer crime is reversed, and the sentence on that count is vacated. In all other respects, the judgment is affirmed. The trial court's restitution order is reversed to the extent it directs that the restitution funds be sent to the Attorney General for distribution. In all other respects, the order is affirmed, and the case is remanded to the trial court to modify the restitution order as directed.

Judge DAILEY and Judge MILLER concur.