23CA0472 Peo v Najera 07-03-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 23CA0472
Adams County District Court No. 21CR1636
Honorable Priscella J. Loew, Judge

_____

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Frederick Alexander Najera,

Defendant-Appellant.

_____

JUDGMENT AFFIRMED

Division VI
Opinion by JUDGE SULLIVAN
Tow and Yun, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced July 3, 2025

_____

Philip J. Weiser, Attorney General, Jenna Baker, Assistant Attorney General
Fellow, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Frederick Alexander Najera, appeals the judgment of conviction entered on jury verdicts finding him guilty of aggravated robbery and menacing.  We affirm.

## I.    Background

¶ 2    The jury heard evidence at trial from which it could have reasonably found the following facts.

¶ 3    In March 2021, Najera robbed a restaurant in Aurora, threatening the cashier with a gun and taking cash from the drawer.  About a month later, the cashier identified Najera as the robber during an out-of-court identification procedure in which she picked him out of a photo array consisting of six photos.  Najera moved to suppress the out-of-court identification as impermissibly suggestive, but the district court denied the motion after an evidentiary hearing.

¶ 4    At trial, the cashier didn't identify Najera as the robber in the courtroom, nor did counsel ask her to do so.  The detective who assisted in administering the identification procedure, however, testified that the cashier had selected Najera's photo from the photo array.  The detective also identified Najera in the courtroom as the person the cashier selected.

¶ 5    The jury found Najera guilty of both aggravated robbery and menacing.

¶ 6    Najera appeals.  He contends that (1) the court should have suppressed the cashier's out-of-court identification; (2) the prosecution committed reversible misconduct; and (3) the court's instruction on reasonable doubt improperly lowered the prosecution's burden.  We address each in turn.

## II.    Out-of-court Identification

¶ 7    Najera first contends that the district court erred by denying his motion to suppress the cashier's out-of-court identification, arguing that the police's photo array and identification procedures were impermissibly suggestive.  We disagree.

### A.    Standard of Review and Applicable Law

¶ 8    "A defendant is denied due process when an in-court identification is based upon an out-of-court identification which is so suggestive as to render the in-court identification unreliable." *People v. Borghesi*, 66 P.3d 93, 103 (Colo. 2003).  Courts apply a two-part test to determine the admissibility of an out-of-court photographic identification.  *Bernal v. People*, 44 P.3d 184, 191 (Colo. 2002).  First, the defendant bears the burden of proving that

2

the photo array was impermissibly suggestive. *Id.* Second, if the defendant meets this burden, the burden shifts to the prosecution to show that the identification was nevertheless reliable under the totality of the circumstances. *Id.*

¶ 9 At the initial step, courts consider "a number of factors" when evaluating whether the photo identification procedure was impermissibly suggestive, including the size of the photo array, the manner of its presentation by the officers, and the details of the photographs themselves. *Id.*; *People v. Palacios*, 2018 COA 6M, ¶ 12. Najera challenges the cashier's out-of-court identification based on each of these factors, which we address below.

¶ 10 To prevent swaying the eyewitness's recollection of the assailant, the photos in an array must not "differ[] significantly" from the eyewitness's initial description. *People v. Singley*, 2015 COA 78M, ¶ 20. In addition, the accused's photo must not stand out from the "filler"[1] photos in a way that suggests to the eyewitness that they are more likely the culprit. *See Bernal*, 44 P.3d at 191.

---

[1] A "[f]iller" is "either a person or a photograph of a person who is not suspected of the offense in question and is included in an identification procedure." § 16-1-109(2)(d), C.R.S. 2024.

3

But the police need not provide a photo array containing only "exact replicas" of the accused's photo. *Id.* (citation omitted). All that is required is that the photos match by race, approximate age, facial hair, and a number of other characteristics. *Id.* at 191-92.

¶ 11    We review the constitutionality of a pretrial identification procedure as a mixed question of law and fact. *Borghesi*, 66 P.3d at 104. We defer to the trial's court's findings of fact but review its legal conclusions de novo. *See Bernal*, 44 P.3d at 190.

## B.    Additional Background

¶ 12    The cashier told police that the robber was about forty years old and described him as "Chicano," although she also mentioned he was "white skinned." While she couldn't recall his exact height, she said that the robber appeared taller than the five-foot-five-inch officer who was interviewing her.

¶ 13    Three weeks after the robbery, the detective assigned to the case received a tip through an email that included a photo of Najera. Based on the tip, the detective created a six-person photo array by inputting Najera's photo into a software program that generated 50 to 100 photos of individuals with similar characteristics, including age, race, weight, and gender. From that

group, the detective selected five fillers' photos to use in the array with Najera's photo, taking into account various factors such as facial expression, presentation, lighting, and clothing.

¶ 14    As prepared by the detective, the six men in the array each had black hair, brown eyes, and varying amounts of facial hair. Each appeared to be of Hispanic ethnicity as described in *Bernal*, 44 P.3d at 193. Their ages ranged between forty-eight and fifty-two years old (Najera was fifty-one at the time of the robbery), and they weighed between 200 and 215 pounds (Najera weighed 210 pounds). Although the photos depicted the men from the shoulders up, thus preventing a viewer from discerning their height, each fell between five feet, five inches and five feet, ten inches in height (Najera says he is five feet, eight inches tall). Four of the men, including Najera, had neck tattoos. Four of the fillers wore T-shirts that were black or muted in color, the fifth filler wore a black hooded sweatshirt, and Najera wore a black V-neck shirt. The backgrounds and lighting appeared similar, except for the filler in photo number three, which had a lighter background and somewhat harsher lightning.

¶ 15 After preparing the photo array, the detective and another officer returned to the restaurant to show it to the cashier. The detective recorded the identification process with his body camera. Before showing the photo array to the cashier, the detective asked her to review a standardized admonishment form. The form advised her, among other things, that the suspect may or may not be in the photo array and that she wasn't obligated to make a selection. The cashier said she understood the form's advisements.

¶ 16 After reviewing the array, the cashier said Najera's photo looked the most like the robber. She said she was "somewhat sure" and that she recognized his eyes and gaze.

¶ 17 Najera moved to suppress the cashier's out-of-court identification, asserting that it was made under suggestive circumstances. At a pretrial hearing on the motion, the detective testified regarding his preparation of the photo array and the cashier's out-of-court identification. In a detailed oral ruling, the court denied Najera's motion, finding that the photo array and the identification procedure weren't impermissibly suggestive.

### C. Size of the Array

¶ 18    Najera concedes that a photo array with "as few as six pictures" isn't a "per se . . . due process violation." *Bernal*, 44 P.3d at 191.  He argues, however, that the relatively small number of photos requires that we more closely scrutinize the array for "suggestive irregularities." *Id.*  We agree on both counts.  While the six-photo array in this case didn't necessarily create a due process violation, it does require that we closely examine both the array and the procedure used for any suggestive irregularities.  *Id.*

### D. Manner of Presentation

¶ 19    Next, Najera argues that the detective presented the array in an impermissibly suggestive manner because (1) the procedure wasn't "blind";[2] (2) all six photos were displayed simultaneously on a single sheet of paper rather than sequentially on multiple sheets;

---

[2] A "[b]lind" procedure means "the administrator of a live lineup, photo array, or showup does not know the identity of the suspect," § 16-1-109(2)(a), while a "[b]linded" procedure means the administrator may know who the suspect is "but does not know in which position the suspect is placed in the photo array when it is viewed by the eyewitness," § 16-1-109(2)(b).  We mean no disrespect to persons with visual impairments by using these statutorily defined terms.

and (3) the photos in the array didn't match the cashier's initial description. We aren't persuaded by these arguments.

¶ 20 First, Najera acknowledges in his brief that the body camera footage shows no "discernable overt signals" by the detective that hinted to which photo depicted Najera. Indeed, the detective denied making any movements that may have suggested which photo depicted Najera. Consistent with this evidence, the district court found that the detective's statements and actions while administering the photo array neither directed the cashier nor influenced her identification. While a "blind" or "blinded" procedure may have been preferable, § 16-1-109(3)(a)(II), C.R.S. 2024 (law enforcement agencies must adopt policies that include protocols guiding the "recommended use" of "blind" and "blinded" photo arrays), on this record we can't say that the non-blind procedure rendered the photo array impermissibly suggestive. *See, e.g.*, *State v. Gholson*, 700 S.W.3d 613, 627 (Mo. Ct. App. 2024) (A non-blind lineup wasn't "impermissibly suggestive" when the detective "denied doing anything to suggest who Victim 2 should identify, and there [wa]s nothing in the record [that] indicat[ed] otherwise.").

¶ 21 Second, Najera identifies no Colorado statute or case that requires photo arrays to be presented sequentially rather than simultaneously. To the contrary, Colorado courts have upheld simultaneous six-photo composites, deeming them not impermissibly suggestive. *See Palacios*, ¶ 14 (citing *People v. Wilford*, 111 P.3d 512, 514 (Colo. App. 2004)). To the extent Najera asserts that a scientific consensus exists that sequential arrays are superior, we disagree. *See Commonwealth v. Thomas*, 68 N.E.3d 1161, 1172 (Mass. 2017) (concluding that "the relative superiority of competing identification procedures [involving simultaneous versus sequential lineups] is unresolved" (quoting Nat'l Rsch. Council, Nat'l Acad. of Scis., *Identifying the Culprit: Assessing Eyewitness Identification* 3 (2014), https://perma.cc/M3C3-GQUS)).

¶ 22 Third, the photos in the array didn't "differ[] significantly" from the cashier's initial description. *Singley*, ¶ 20. Najera argues that the cashier initially described the robber as five feet, five inches to five feet, seven inches tall, approximately forty years old, and "white skinned"; but he is five feet, eight inches tall, was fifty-one years old

when the robbery occurred, and has a "Hispanic or Latino" complexion. We reject these arguments as follows:

- The cashier testified that she "never affirmed" that the robber's height was five feet, five inches to five feet, seven inches; rather, she described him as "taller than the police officer" who interviewed her. That officer was five feet, five inches tall. Regardless, the photos in the array depicted the men from the shoulders up, removing their relative heights from the cashier's consideration.

- The men in the photo array ranged between forty-eight and fifty-two years old. While older than cashier's estimate of forty, none appeared significantly older to the point that the photos may have impermissibly suggested an alternative description of the assailant. *See Singley*, ¶¶ 19-20; *cf. id.* at ¶ 23 (defendant satisfied *Bernal*'s first prong when photo array depicted men "twice as old" as eyewitness's initial description).

- The cashier told the police that the robber may have been "Chicano." And when asked at trial what she meant when she also described him as "white skinned," she said

"[t]hat could be Hispanic." We conclude any inconsistencies in the cashier's initial description were ripe for cross-examination and go to the weight of her identification, not its admissibility. *See Singley*, ¶ 33.

¶ 23 In addition, the detective provided the cashier with an admonishment form that advised her that (1) the photo array may or may not contain a photo of the suspect, and (2) she didn't have to identify anyone. Under these circumstances, we conclude the photo array didn't impermissibly suggest an alternative description of the robber.

### E. The Photos

¶ 24 Najera also argues that the photos themselves were impermissibly suggestive because Najera had the lightest skin tone and was the only one in the array wearing jail clothes. We aren't persuaded.

¶ 25 The detective testified he used a software program that produced 50 to 100 photos of individuals with characteristics similar to Najera's, including his race. From those, the detective selected five filler photographs to achieve a "homogenous" appearance among the photos in the array. Having reviewed the

11

array, we agree with the detective's overall assessment and conclude that any differences in skin tone between Najera and the fillers were negligible. *Cf. People v. Shanks*, 2019 COA 160, ¶ 50 ("We are in the same position as the district court to review the details of the photographs and consider their placement in the array."); *see also Bernal*, 44 P.3d at 191 (police need not provide "exact replicas" in the photo array) (citation omitted).

¶ 26 We also aren't persuaded that Najera's jail clothing differentiated him from the fillers in a way that rendered the array impermissibly suggestive. Even accepting Najera's argument that his dark V-neck shirt was unique among the photos in the array, his clothing wasn't "connected to a specific, identifying feature" that the cashier raised during her identification. *Borghesi*, 66 P.3d at 104. Moreover, the district court determined, and we agree, that an observer wouldn't necessarily affiliate Najera's dark V-neck shirt with someone in custody. *See People v. Owens*, 97 P.3d 227, 233 (Colo. App. 2004) (concluding that nothing in the defendant's picture "suggest[ed] that the [green] shirt originated from the department of corrections, as opposed to some more innocuous

12

source, such as hospital attire"), *overruled in part on other grounds by Garcia v. People*, 2022 CO 6.

¶ 27     Accordingly, the district court didn't err by denying Najera's motion to suppress the cashier's out-of-court identification. Because Najera didn't meet his burden under *Bernal*'s first step, we need not proceed to the second. *See Bernal*, 44 P.3d at 191.

### III.     Prosecutorial Misconduct

¶ 28     Najera contends that the district court erred by failing to correct misconduct during the prosecution's opening statement, case-in-chief, and closing argument. We perceive no basis to reverse.

#### A.     Standard of Review and Applicable Law

¶ 29     "Whether a prosecutor's statements constitute misconduct is generally a matter left to the trial court's discretion." *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005). We won't disturb the court's rulings regarding such statements absent an abuse of that discretion. *People v. Strock*, 252 P.3d 1148, 1152 (Colo. App. 2010).

¶ 30     When reviewing claims of prosecutorial misconduct, we conduct a two-step analysis. *Wend v. People*, 235 P.3d 1089, 1096

13

(Colo. 2010). First, we determine whether the prosecutor's conduct was improper based on the totality of the circumstances. *Id.* Second, if we determine that the comments were improper, we evaluate whether they warrant reversal under the proper standard of reversal. *Id.*

¶ 31    When the alleged misconduct involves closing argument, we consider the prosecutor's questionable comments in the context of the argument as a whole and in light of the evidence before the jury. *People v. Samson,* 2012 COA 167, ¶ 30. A prosecutor may comment on the evidence at trial and the reasonable inferences that can be drawn from the evidence. *Id.* at ¶ 31. The prosecutor also enjoys wide latitude in the language and style they choose to employ and in replying to arguments by opposing counsel. *Id.* at ¶ 30; *see also People v. Roadcap,* 78 P.3d 1108, 1114 (Colo. App. 2003) ("A prosecutor has wide latitude to respond to a defendant's 'opening salvos' in closing argument.") (citation omitted). And because arguments delivered in the heat of trial aren't always perfectly scripted, we give the prosecutor the benefit of the doubt when their remarks are ambiguous or simply inartful. *Samson,* ¶ 30.

¶ 32    Still, a prosecutor must exercise caution not to use closing arguments to mislead or unduly influence the jury. *Domingo-Gomez,* 125 P.3d at 1049. A prosecutor may not, for example, intentionally misstate the evidence or attempt to inflame the jury's passions. *See id.*

¶ 33    When a defendant asserts that the prosecution has improperly shifted its burden of proof, as here, we consider the degree to which (1) the prosecutor specifically argued or intended to establish that the defendant carried the burden of proof; (2) the prosecutor's actions constituted a fair response to the questioning and comments of defense counsel; and (3) the court and counsel informed the jury about the defendant's presumption of innocence and the prosecution's burden of proof. *People v. Santana,* 255 P.3d 1126, 1131-32 (Colo. 2011).

¶ 34    Najera preserved only some of his prosecutorial misconduct contentions through contemporaneous objections. We review his preserved contentions for either constitutional or nonconstitutional harmless error, depending on the way in which the argument is alleged to have been improper. *See Crider v. People,* 186 P.3d 39, 42 (Colo. 2008); *People v. Ortega,* 2015 COA 38, ¶ 51. But we

review his unpreserved contentions for plain error. *Hagos v. People*, 2012 CO 63, ¶ 14. We will reverse for plain error only if the misconduct was obvious and so undermined the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction. *People v. Walker*, 2022 COA 15, ¶ 28.

## B. Additional Background

¶ 35 In opening statements, the prosecutor summarized some evidence that she anticipated the jury would hear, including video footage of the robbery, the detective's investigation, photographs of Najera, and eyewitness accounts. After summarizing the evidence, the prosecutor ended her opening statement by asking the jury to "hold [Najera] responsible for robbing a 21-year-old cashier who [wa]s just trying to get through her day at [the restaurant], hold him accountable and find him guilty."

¶ 36 During the prosecution's case-in-chief, the prosecutor asked the cashier, "Did the defendant approach you?" Defense counsel objected based on "[f]acts not in evidence," but the court overruled the objection. The cashier answered, "Yes."

¶ 37 As part of his defense, Najera called a cognitive psychologist to testify as an expert in eyewitness memory and reliability. The

expert opined, among other things, that persons experiencing frightening events tend to narrow their focus to only "central" facts and fail to remember smaller "peripheral" details.

¶ 38 In the prosecution's initial closing argument, the prosecutor referred to the trauma endured by the restaurant's employees during the robbery and how they shouldn't have to relive their experience. The following remarks are illustrative:

> They had to relive that traumatic experience. And whenever [the cashier] was looking at that I.D. pack, that six pack that was so heavily scrutinized, but when she had to relive it, it produced a visceral reaction and emotion. It is emotion that she came back to while on the stand.
>
> . . . .
>
> I want to push back on that and point out the nerves, the emotion, the trauma, and having to relive that. And having to do that. And there was nothing that was required of them to do that.
>
> . . . .
>
> [Najera] is the one that subjected [the restaurant employees] to a terrible time in their life. He is the robber.

¶ 39 Defense counsel then delivered her closing argument, arguing in part that the prosecution's case was full of "blanks" and "missing

evidence," including the cashier's failure to identify Najera in the courtroom.

¶ 40    In rebuttal closing, the prosecutor countered by arguing that the jury shouldn't succumb to speculating about evidence that wasn't presented:

> Now, the lack of evidence. Gun. You didn't hear — your [sic] didn't see any gun today. Defense is asking you to speculate. Getaway car. Same thing. Defense is asking you to speculate. Cash. You didn't hear from [a particular restaurant employee]. Defense is asking you to speculate what her testimony would be. The defense is asking you to speculate what the officers would have seen or testified to. Defense is asking you to speculate what nearby surveillance footage would have shown you.

¶ 41    Defense counsel objected to burden shifting, which the court overruled. At that point, the prosecutor acknowledged that she carried the burden of proving the elements of the offenses beyond a reasonable doubt.

¶ 42    The prosecutor also returned to the trauma visited upon the restaurant employees, explaining the prosecution "didn't want to subject them to having to identify the man who robbed them, who caused them one of the most traumatic events in their life."

18

## C.    Preserved Contentions

### 1.    Presupposing Najera's Identity

¶ 43    Najera argues that the prosecutor improperly asserted facts not in evidence by asking the cashier, "Did the defendant approach you?"  The prosecutor's framing, Najera asserts, improperly assumed that he was the robber.  But the cashier could reasonably interpret the prosecutor's question as asking both (1) whether someone approached her in the restaurant during the robbery and, if yes, (2) whether that person was the defendant.  The cashier had the option to answer, "No," to one or both parts of the question or to seek clarification.  But she answered, "[Y]es."  On this record, we can't say that the court abused its discretion by overruling Najera's objection.  *See* CRE 611(a) (trial courts may exercise control over the mode and order of interrogating witnesses); *cf. United States v. Cohen*, 583 F.2d 1030, 1044 (8th Cir. 1978) (trial court didn't err by permitting the prosecutor to ask a compound question).

¶ 44    We aren't persuaded otherwise by Najera's reliance on *People v. Fortson*, 2018 COA 46M, and *People v. Estep*, 583 P.2d 927 (Colo. 1978).  In *Fortson*, ¶¶ 29-31, the prosecutor asked about inadmissible CRE 404(b) evidence, while in *Estep*, 583 P.2d at 930,

the prosecutor asked an "improper" and "prejudicial" question that conveyed the prosecutor's personal belief that the defendant was guilty. Neither occurred here.

¶ 45 Moreover, even if the prosecutor's question assumed facts not in evidence, any error was harmless. *See Hagos*, ¶ 12. The cashier testified just a few moments later that she circled on the photo array the person she believed robbed the restaurant; later that same day, the detective (1) testified that the cashier selected Najera's photo and (2) identified Najera in the courtroom as the person the cashier identified.

### 2. Use of "Speculation" in Rebuttal Closing Argument

¶ 46 Najera argues that the prosecutor misstated and shifted the burden of proof by telling the jury during rebuttal closing that the defense was inviting it to "speculate" about certain unadmitted evidence. Applying *Santana*'s three-part framework, we perceive no improper burden shifting. *See* 255 P.3d at 1131-32.

¶ 47 First, the prosecutor specifically argued during rebuttal closing that the prosecution, not Najera, shouldered the burden of proving every element of the charged offenses beyond a reasonable doubt. *See id.* at 1131.

¶ 48     Second, the prosecutor's comments constituted a fair response to defense counsel's closing argument.  *See id.*; *Roadcap*, 78 P.3d at 1114.  Defense counsel repeatedly asked the jurors to focus on the prosecution's "lack of evidence" and "missing evidence."  Specifically, defense counsel argued that the prosecution hadn't presented exterior surveillance footage, a DNA test of Najera, the robber's gun, evidence about the getaway car or driver, the stolen cash, or the robber's distinctive clothes.  Given these arguments, the prosecutor's comments were a fair reply and didn't improperly shift the burden of proof.

¶ 49     Third, the court and counsel properly informed the jury about Najera's presumption of innocence and the prosecution's burden of proving Najera's guilt beyond a reasonable doubt.  *See Santana,* 255 P.3d at 1131-32.

### D.    Unpreserved Contentions

#### 1.    Invoking Themes of Sympathy and Accountability

¶ 50    Turning to Najera's unpreserved contentions of prosecutorial misconduct, Najera argues that the prosecutors[3] improperly invoked themes of sympathy and accountability during opening statement, initial closing argument, and rebuttal closing argument. Among others, he points to the prosecutors' arguments (1) that the jury should hold Najera "accountable"; (2) that Najera subjected the restaurant employees to a "terrible time in their life"; and (3) that the cashier had "a visceral reaction" and cried on the witness stand and in the body camera footage.

¶ 51    But the prosecutors made these comments while summarizing the evidence against Najera.  During opening statement, for example, the prosecutor made her challenged comment immediately after discussing the videos, photographs, and witness testimony that the prosecution anticipated presenting.  So too in closing arguments.  The prosecutors properly tethered their remarks to the

---

[3] The prosecution team consisted of two attorneys — one who delivered opening statement and rebuttal closing argument, and a second who delivered initial closing argument.

cashier's testimony and the video evidence. *See People v. Garcia*, 2021 COA 80, ¶ 40 ("In opening statement and in closing argument, the prosecutor asked the jury to 'do the right thing' only after discussing the evidence. In context, the prosecutor asked the jury to 'hold [Garcia] accountable' because the evidence tended to show Garcia was guilty, and the jury likely would have understood his statements accordingly."), *aff'd*, 2023 CO 30.

¶ 52     In addition, while the prosecutors' comments touched on the cashier's trauma, the significance of that trauma on the cashier's memory was a disputed issue at trial. The defense's expert testified that fear could narrow one's focus and influence memory. The prosecution vigorously disputed some of the expert's conclusions. The cashier's memory, demeanor, and credibility were therefore highly relevant. *See People v. Constant*, 645 P.2d 843, 846 (Colo. 1982) (a prosecutor is allowed to draw reasonable inferences regarding a witness's demeanor and credibility). Under these circumstances, the prosecutors' comments were properly "anchored in the evidence, not in emotion," and didn't improperly ask the jury to "do justice" for the victims regardless of whether the jury believed the prosecution's evidence. *People v. Salazar*, 2023 COA 102, ¶ 51.

¶ 53    Even if the prosecutors' comments crept near or slightly over the line, we see no obvious error that required the court to intervene on its own accord.  *See Domingo-Gomez,* 125 P.3d at 1054 ("The lack of an objection may demonstrate the defense counsel's belief that the live argument, despite its appearance in a cold record, was not overly damaging.") (citation omitted).  As a result, the "drastic remedy" of reversal under the plain error standard isn't warranted.  *Id.* at 1055.

### 2.    Asserting Facts Not in Evidence and Evoking Sympathy

¶ 54    Najera also argues that the prosecutors asserted facts not in evidence and improperly evoked sympathy by arguing in initial and rebuttal closing arguments that they refrained from asking the restaurant employees to identify Najera in court to spare them from reliving "one of the most traumatic events in their life."  We disagree for the following reasons:

- A prosecutor's reasons for asking or not asking a witness a particular question aren't "facts" that can be admitted into evidence.

- As already explained, the employees' memory, credibility, and demeanor were contested issues, and the evidence

suggested that their trauma may have affected their recollection. The prosecutors were therefore permitted to comment on the employees' trauma. *See Samson*, ¶ 31.

- At least as it pertains to the prosecutor's rebuttal closing, the prosecutor was responding to defense counsel's closing argument. Defense counsel criticized the employees' failure to identify Najera in the courtroom, saying they never answered "a really simple question, [D]o you recognize the person who did this in the courtroom today[?]" Given this opening salvo, the prosecutor appropriately explained her reasons for omitting what some jurors may have viewed as a critical question. *See Walker*, ¶ 40 (reviewing court must consider defense counsel's "opening salvo" when evaluating prosecutor's remarks) (citation omitted).

¶ 55    Accordingly, we reject Najera's contentions that the prosecutors engaged in reversible misconduct.

### IV.    Reasonable Doubt Instruction

¶ 56    Najera contends that the district court erred by instructing the jury consistently with the 2021 model criminal jury instruction on

25

reasonable doubt.  *See* COLJI-Crim. E:03 (2021).  He argues that multiple phrases in the model instruction improperly lowered the prosecution's burden.  We discern no error in the court's instruction.

### A.  Standard of Review and Applicable Law

¶ 57    "The Due Process Clause of the United States Constitution 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'"  *Tibbels v. People*, 2022 CO 1, ¶ 23 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)).

¶ 58    "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof."  *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (citation omitted).  Our supreme court approves the Colorado Model Criminal Jury Instructions in principle, which serve as "beacon lights" to guide trial courts.  *Galvan v. People*, 2020 CO 82, ¶ 38.  But the model instructions aren't binding and don't insulate a court's instructional

26

error from reversal. *See id.*; *People v. Schlehuber*, 2025 COA 50, ¶ 14.

¶ 59    We review de novo whether the district court accurately instructed the jury on the law. *Tibbels*, ¶ 22.

### B.    Additional Background

¶ 60    Consistent with the 2021 model instruction, the court instructed the jury on reasonable doubt, in part, as follows:

> Every person charged with a crime is presumed innocent. This presumption of innocence remains with Mr. Najera throughout the trial and should be given effect by you unless, after considering all of the evidence, you are then convinced that Mr. Najera is guilty beyond a reasonable doubt.
>
> The burden of proof is upon the prosecution to prove to the satisfaction of the jury beyond a reasonable doubt the existence of all of the elements necessary to constitute the crime charged.
>
> Reasonable doubt means a doubt based upon reason and common sense which arises from a fair and rational consideration of all of the evidence, or the lack of evidence, in the case. It is a doubt which is not a vague, speculative or imaginary doubt, but such a doubt as would cause reasonable people to hesitate to act in matters of importance to themselves.

## C. "Arises From" and "Hesitate to Act" Language

¶ 61 Najera argues that the court's instruction didn't accurately inform the jury that the prosecution exclusively bore the burden of proof. Pointing to specific language in the instruction, he argues that (1) the "arises from" language could reasonably be understood to shift the prosecution's burden, and (2) the "hesitate to act in matters of importance" phrase lowered the prosecution's burden by likening it to everyday decision-making.

¶ 62 A division of this court has previously rejected these arguments. *See People v. Rubio*, 222 P.3d 355, 363 (Colo. App. 2009). In *Rubio*, the division determined that the model instruction didn't improperly reverse or lower the prosecution's burden. *Id.* In doing so, it approved both the "arise from" and "hesitate to act" language, explaining that the United States Supreme Court has repeatedly endorsed reasonable doubt instructions containing both phrases. *Id.* (collecting cases). We agree with *Rubio*'s analysis and see no reason to depart from its holding.

¶ 63 We aren't convinced otherwise by Najera's reliance on *Tibbels* and *People v. Knobee*, 2020 COA 7. The trial courts in those cases deviated from the model jury instruction by improperly analogizing

28

the concept of reasonable doubt to buying a home with a foundation crack and choosing a doctor. *See Tibbels*, ¶¶ 10-12; *Knobee*, ¶ 18. No such analogy occurred here.

## D. "Utmost Certainty"

¶ 64 Najera also argues that the court's instruction failed to convey the height of the beyond a reasonable doubt standard and that the court should have given the defense's alternative instruction that asked the jury to reach a state of "utmost certainty."

¶ 65 But again, a division of this court has already considered and rejected this argument. *See People v. Robb*, 215 P.3d 1253, 1263 (Colo. App. 2009) ("[A] reasonable doubt instruction need not be phrased in terms of proof of 'utmost certainty.'") (citation omitted). We agree with the division's reasoning and follow it here.

## V. Disposition

¶ 66 We affirm the judgment.

JUDGE TOW and JUDGE YUN concur.