**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

v.

**Demetrius HERRON, Defendant–Appellant.**

No. 08CA0217.

Colorado Court of Appeals, Div. IV.

Oct. 14, 2010.

Rehearing Denied Nov. 10, 2010.

John W. Suthers, Attorney General, Joseph G. Michaels, Assistant Attorney General, Denver, Colorado, for Plaintiff–Appellee.

Harvey & Owens Law Firm, Cynthia A. Harvey, Victor T. Owens, Castle Rock, Colorado, for Defendant–Appellant.

Opinion by Chief Judge DAVIDSON.

Defendant, Demetrius Herron, appeals from the judgment entered on a jury verdict finding him guilty of two counts of stalking and two counts of misdemeanor harassment. He also appeals from his sentence as a habitual criminal. We affirm in part, vacate in part, and remand.

## I. Background

In February 2006, defendant approached Ms. R while she was walking on a treadmill in her apartment complex's exercise room. Defendant did not live in the apartment complex. They spoke for a short time, but Ms. R found defendant's questions to be increasingly personal, and told him she did not want to talk any longer. According to her testimony, defendant became angry, approached within arm's length of her, and asked whether she had an issue with his race. Defendant and Ms. R were of different races.

Feeling threatened, Ms. R removed a pair of scissors from her pocket. Defendant backed away, saying: "What do you think, I am going to rape you?" Then, he told her he had seen her leaving for church the previous Sunday morning, accurately described the shirt she had been wearing, and left the room.

On May 3, Ms. R returned home from work around 1 a.m. Taking the stairs to her third floor apartment, she encountered defendant on the second floor landing. After she passed him, he followed her up the stairs, saying, "Hello [Ms. R]. It's good to see you again." Ms. R told defendant she would scream if he did not leave her alone.

Without answering, defendant walked past her and around a corner in the hallway. Ms. R could see his elbow protruding around the corner, however. Concerned that he was waiting to see which apartment she entered, she asked, "Do I need to call the police?" She saw his elbow withdraw.

Based on this evidence, a jury found defendant guilty of credible threat stalking, former § 18–9–111(4)(b)(I) (now codified at § 18–3–602(1)(a), C.R.S.2010); emotional distress stalking, former § 18–9–111(4)(b)(III) (now codified at § 18–3–602(1)(c), C.R.S.2010); and two counts of misdemeanor harassment, § 18–9–111(1)(c), C.R.S.2010. The court subsequently found him guilty of three habitual criminal counts, and sentenced him to two concurrent twelve-year terms on his stalking convictions, and two concurrent six-month terms on his harassment convictions.

## II. Double Jeopardy

On appeal, defendant contends that his two stalking convictions constituted multiple punishments for the same offense. Because we agree with his double jeopardy argument, we do not address his alternative contention that the court erred in failing to require the prosecution to specify what conduct comprised

emotional distress stalking and credible threat stalking or to give the jury a unanimity instruction concerning the stalking counts.

### A. Standard of Review

■ Error resulting in multiplicitous convictions implicates a fundamental right, is obvious, and affects the fairness and integrity of the proceedings. *See People v. Vigil*, 251 P.3d 442, 448–49 (Colo.App.2010) (addressing multiplicity issue sua sponte). Thus, although defendant did not raise the multiplicity issue in the trial court, we will review it for plain error. *People v. Flowers*, 128 P.3d 285, 290 (Colo.App.2005) (reviewing under a plain error standard defendant's double jeopardy argument raised for the first time on appeal); *People v. Cruthers*, 124 P.3d 887, 890 (Colo.App.2005) (same); *People v. Olson*, 921 P.2d 51, 53 (Colo.App.1996) (same).

■ Plain error "so undermine[s] the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Kruse*, 839 P.2d 1, 3 (Colo.1992) (quoting *Wilson v. People*, 743 P.2d 415, 420 (Colo.1987)); *accord Flowers*, 128 P.3d at 290.

### B. Legal Framework

■■ Multiplicity is "the charging of multiple counts and the imposition of multiple punishments for the same criminal conduct." *Woellhaf v. People*, 105 P.3d 209, 214 (Colo. 2005) (citing *People v. Borghesi*, 66 P.3d 93, 98 (Colo.2003)). Unless expressly authorized by the General Assembly, multiplicitous convictions violate the Double Jeopardy Clauses of the United States and Colorado Constitutions. U.S. Const. amend. V; Colo. Const. art. II, § 18; *People v. Abiodun*, 111 P.3d 462, 465 (Colo.2005).

■ In addressing a multiplicity challenge, the proper inquiry is whether the General Assembly's definition of the crime charged encompasses a continuous course of conduct. *People v. Renander*, 151 P.3d 657, 661 (Colo.App.2006). This requires consideration of the statutorily allowable unit of prosecution: "the manner in which a criminal statute permits a defendant's conduct to be divided into discrete acts for purposes of

prosecuting multiple offenses." *Woellhaf*, 105 P.3d at 215; *see also Vigil*, 251 P.3d at 448–49. To determine the unit of prosecution, we look to the statute's plain meaning, within the context of the purpose for which it was enacted. *People v. Montez*, —— P.3d ——, —— (Colo.App.2010).

### C. Application

■ Former section 18–9–111(4)(b), as relevant here, provided:

> A person commits stalking if directly, or indirectly through another person, such person knowingly:
>
> (I) Makes a credible threat to another person and, in connection with such threat, repeatedly follows, approaches, contacts, or places under surveillance that person . . .; or
>
> (III) Repeatedly follows, approaches, contacts, places under surveillance, or makes any form of communication with another person . . . in a manner that would cause a reasonable person to suffer serious emotional distress and does cause that person . . . to suffer serious emotional distress.

*Cf.* § 18–3–602(1)(a), (c) (language substantially identical to § 18–9–111(4)(b)(I), (III)).

We conclude from the plain words of the statute that the legislatively defined unit of prosecution for the crime of stalking is a continuous course of conduct by which one repeatedly follows, approaches, contacts, or places another under surveillance. Therefore, we further conclude that defendant's course of conduct directed at Ms. R amounted to a single crime for which the General Assembly has not authorized multiple punishments.

■ We observe that, by its terms, the statute does not contain any specific authorization for multiple punishments for each act of stalking. Instead, when, as here, the legislature joins "a number of acts . . . as a disjunctive series," rather than describes them in different provisions, under different titles, it defines alternative means of committing a single offense. *Abiodun*, 111 P.3d at 465–66; *accord Woellhaf*, 105 P.3d at 217 ("The disjunctive 'or' demarcates different categories."); *People v. Holmes*, 129 Colo.

180, 183, 268 P.2d 406, 407 (1954) ("[B]y the use of the word 'or' [the forgery statute] provides disjunctively the ways of its violation. . . ."); *Wright v. People,* 116 Colo. 306, 310, 181 P.2d 447, 449 (1947).

■ Furthermore, the statute requires that the acts constituting stalking, namely, following, approaching, contacting, or placing another under' surveillance, *see* § 18–9–111(4)(b)(I), (III), must be performed "repeatedly." Consequently, per victim, stalking can occur only when there is conduct comprising two or more occurrences of the specified acts. *See Abiodun,* 111 P.3d at 466 (where "acts chosen for specific inclusion [in a criminal statute] are not themselves mutually exclusive but overlap in various ways [they] cover a continuum of conduct"); *accord People v. Berner,* 42 Colo.App. 520, 521–22, 600 P.2d 112, 113 (1979) (where two blows delivered to one victim as part of "a continuous harangue to extract information," both blows part of single criminal transaction); *cf. Borghesi,* 66 P.3d at 95 (where robber took store's property from two employees in the course of a single robbery, two convictions not multiplicitous because robbery statute intended to protect each person in control of property).

Thus, for defendant to be convicted of stalking, he had to have followed, approached, contacted, or surveiled Ms. R on at least two occasions. To be convicted of a second stalking offense, he would have had to so act, in a separate transaction that is factually distinct from the first, on at least two more occasions. *See Quintano v. People,* 105 P.3d 585, 591–92 (Colo.2005) (listing factors such as lapse of time between incidents, location of the incidents, intervening events, and the defendant's intent as evidenced by his actions and statements, to determine whether incidents were sufficiently distinct to constitute a separate transaction); *see also Woellhaf,* 105 P.3d at 219.

Here, the evidence was not sufficient to establish a second stalking offense. The three occasions on which defendant followed, watched, or approached Ms. R—when defendant observed her leaving for church; the encounter in the fitness room; and the encounter in the stairway—were not factually distinct. Although approximately three months elapsed between the first two occasions and the third, all took place in or around the victim's apartment complex, and defendant's conduct indicated that his intent to make advances toward Ms. R remained consistent. Moreover, during the second and third encounters, defendant referenced a prior encounter, and no intervening events occurred to sever the connection between each of his advances.

Even if the third encounter, which took place three months after the first two encounters (which had taken place within one week of each other) was factually distinct from the first two, it would not support a second count of stalking because no additional contact or surveillance took place thereafter. That is, even as a separate transaction, defendant's third encounter with Ms. R did not constitute the offense of stalking because it was not repeated. *See* § 18–9–111(4)(b)(I), (III).

This interpretation is fully consistent with the express purpose of the stalking statute, which is to "recognize[ ] the seriousness posed by stalking" and "encourage[ ] and authorize[ ] effective intervention before stalking can escalate into behavior that has even more serious consequences." § 18–3–601(2), C.R.S.2010 (formerly codified at § 18–9–111(4)(a)). Acknowledging that one person may stalk another in a wide variety of manners, and that victims' responses to stalking behavior similarly may vary, effectuates this objective, but imposing multiple convictions for acts falling within a single course of conduct does not. *See* § 18–1–408(3), C.R.S. 2010 (where a defendant is guilty of multiple counts supported by identical evidence, sentences imposed shall run concurrently); *cf. Montez,* —— P.3d at —— (where statute prohibiting convicted felon from possessing "a firearm," imposing sentence for each firearm possessed effectuates purpose of "limit[ing] the possession of firearms by [felons]").

Accordingly, we agree with defendant that the evidence supports only one conviction for stalking and, therefore, one of the stalking convictions must be vacated. *See People v. Lowe,* 660 P.2d 1261, 1269–71 (Colo.1983)

(identical concurrent sentences can constitute multiple punishment for a single offense because the collateral consequences exacted by a felony conviction extend beyond the sentence imposed), *abrogated on other grounds by Callis v. People,* 692 P.2d 1045 (Colo. 1984).

### III. Evidence of Prior Acts

Defendant also contends that the trial court reversibly erred by allowing the admission of evidence of prior acts. The People argue that all of the evidence was properly admitted. We agree with defendant only in part, and find no basis for reversal.

### A. CRE 404(b) Evidence

▮▮▮▮ Evidence of a person's other acts is admissible as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," and for other relevant purposes. CRE 404(b). Such evidence must, however, be logically relevant to a fact in issue other than the character of the person who committed the other acts, and its probative value must not be substantially outweighed by the danger of unfair prejudice. *People v. Wallen,* 996 P.2d 182, 185 (Colo.App.1999). *See also* E. Imwinkelried, *Evidentiary Foundations* 130 (2d ed.1989) (citing CRE 403, 404(b)).

### B. Proceedings Before the Trial Court

Over defendant's objections, the People introduced the following testimony about his prior acts:

- Defendant approached Ms. C while she was exercising in her apartment complex's fitness room. His personal questions about where she lived and whether her husband was at home, and his observation that her chest was not sweating, made her uncomfortable. He mentioned that he had seen Ms. C earlier that day, and accurately described what she had been wearing. Finally, he closed the door to the fitness room, which Ms. C had propped open, and said that he was not going to hurt her. Frightened, Ms. C left the room.

- Officer Lewis, who took Ms. C's report and questioned defendant about the encounter in the fitness room, testified that defendant had commented that Ms. C "looked really fine" in the "tight ass jeans" he had seen her wearing earlier, and that he had been "reckless[ly] eyeballing" and "eye fucking" her.

- Defendant "jumped out in front of" Ms. Z when she was walking alone, late at night, said she looked "fine," put his hand on her hip, and asked whether she wanted him. After Ms. Z told him she was not interested, defendant said that "it would only be fair if he gave [her] a head start." Ms. Z ran, but was unsure whether defendant pursued her.

- Officer Bromley, who took Ms. Z's report and questioned defendant, testified that defendant stated that Ms. Z had been wearing "tight ass jeans," and that he "could have had the bitch if he wanted her."

- Ms. J passed defendant as the two were walking on a trail. Defendant uttered something to call Ms. J's attention to him, and she saw that he had exposed himself and was masturbating.

- Officer Brockman investigated Ms. J's indecent exposure call, interviewed defendant, and presented Ms. J with a photo array from which she identified defendant.

- B.S., a middle school student walking to school, and Ms. H, a woman driving nearby, noticed defendant walking up and down the street and, after passing B.S., changing direction to walk behind her. Ms. H offered, and B.S. accepted, a ride to school so she could avoid defendant.

The court gave a limiting instruction to the jury prior to Ms. C's, Ms. B's, Ms. H's, and Ms. J's testimony, and before it began deliberation.

### C. Standard of Review

▮▮▮▮ Contrary to defendant's argument, the erroneous admission of CRE 404(b) evidence is not error of constitutional dimension. *Yusem v. People,* 210 P.3d 458, 469 n. 16 (Colo.2009) (citing *Masters v. People,* 58 P.3d 979, 1002–03 (Colo.2002)). Therefore,

any error committed by the trial court in admitting evidence of defendant's prior acts need not be proved harmless beyond a reasonable doubt. *Cf. Krutsinger v. People,* 219 P.3d 1054, 1058 (Colo.2009) (for appellate court to hold constitutional error harmless, it must be convinced that it was harmless beyond a reasonable doubt).

■ Whether to admit evidence of other acts is within the discretion of the trial court, and the court's decision to admit such evidence will be upheld unless it was manifestly arbitrary, unreasonable, or unfair. *Yusem,* 210 P.3d at 463.

### D. Analysis

■ The four-part test articulated in *People v. Spoto,* 795 P.2d 1314, 1318 (Colo. 1990), governs the admissibility of evidence of defendant's prior acts. We consider (1) whether the purposes for which the evidence is proffered relate to a material fact; (2) whether the evidence is logically relevant to the purposes for which it is offered; (3) whether that relevance is independent of the intermediate inference of bad character; and (4) whether the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *Id.; see* CRE 401, 403.

■ Here, the prosecution offered, and the court accepted, the evidence to show motive, intent, knowledge, preparation, common plan or scheme, opportunity, and state of mind. Although the purposes were "carelessly grouped together, without consideration of whether the prior act evidence was admissible for each purpose," *Yusem,* 210 P.3d at 464, we must review each purpose as it relates to both the stalking and harassment charges.

### 1. Material Fact

This first prong of the *Spoto* test asks whether the evidence is offered to prove a fact of consequence to the determination of the action. *Yusem,* 210 P.3d at 464. We agree that, here, it was.

The evidence was offered to show defendant's mental state, intent, knowledge, and motive. More specifically, it was offered to establish that defendant knew his advances toward Ms. R would cause a reasonable person either to fear for her safety or to suffer serious emotional distress, under former section 18–9–111(4)(b)(I) and (III); that he intended harass, annoy, or alarm her under section 18–9–111(1); and what his motivation was to do so. Because state of mind—another proffered purpose—encompasses the other three purposes, we do not separately consider it.

Likewise, although not in dispute, the evidence was offered to show opportunity, preparation, and common plan or scheme, specifically, that defendant committed the actus reus elements of stalking and harassment by approaching and following the victim in a public place. *See Yusem,* 210 P.3d at 464 n. 11.

### 2. Logical Relevance

Next, we consider whether the inferences relied upon by the prosecution could be drawn from the prior acts evidence, and whether the evidence supporting those inferences was logically relevant to the purposes for which it was offered. *See id.* at 464–65.

#### a. Inferences

The People contend that a jury could infer from defendant's prior acts that he (1) monitored women; (2) behaved in an invasive and inappropriate manner toward them; and (3) became angry when they expressed lack of interest.

As displayed in the following chart, defendant's advances toward Ms. C and Ms. Z, his indecent exposure before Ms. J, and his remarks to the investigating officers support at least some of these inferences. The testimony of Ms. H and B.S., however, does not.

| | Monitoring | Invasive & Inappropriate | Angry at Lack of Interest |
|---|---|---|---|
| Ms. C | X | X | X |
| Officer Lewis | X | X | |
| Ms. Z | | X | X |
| Officer Bromley | | X | X |
| Ms. J | | X | |
| Officer Brockman | | X | |
| Ms. H | | | |
| B.S. | | | |

First, defendant's comments to Ms. C and Officer Lewis about the outfit he had seen Ms. C wearing before he approached her in the fitness room supported the inference that he monitors women.

Second, defendant's advances toward Ms. C and Ms. Z, his statements about those encounters to Officers Lewis and Bromley, his indecent exposure and masturbation before Ms. J, and Officer Brockman's testimony corroborating the latter incident supported the inference that his behavior toward women was invasive and inappropriate.

Third, evidence that defendant closed the door to Ms. C's fitness room, telling her he was not going to hurt her; that he offered Ms. Z a head start when she turned him down; and that he told Officer Bromley that he "could have had that bitch [Ms. Z] if he wanted her," supported the inference that defendant becomes angry when his advances are rejected.

However, even giving Ms. H's and B.S.'s testimony the maximum probative value urged by the People, see id., it contained no indication that defendant had monitored B.S., that his decision to turn and walk in the same direction as she was invasive or inappropriate, or that he became angry in connection with that encounter.

### b. Evidence's Relevance to the Proffered Purposes

Based on these inferences, the evidence supporting them was logically relevant to the purposes for which it was offered.

Evidence suggesting defendant knew that his manner of approaching women caused them to experience fear and emotional distress tended to establish his knowledge that similar advances would have that effect on Ms. R. The fact that two women called the police (who contacted defendant) further reinforces the conclusion that defendant knew his conduct caused fear and emotional distress.

Further, evidence establishing defendant's knowledge also was relevant to his intent and motive; that he knew the likely effect of his actions makes it more probable that he intended, and was motivated, to cause it by harassing, annoying, or alarming his victim.

Likewise, the evidence was logically relevant to those purposes related to the actus reus elements of stalking and harassment. Evidence supporting an inference of defendant's monitoring behavior made it more likely that, after observing Ms. R, defendant prepared to approach her and created an opportunity to do so. And evidence of defendant's substantially similar encounter with Ms. C tended to establish a common plan or scheme to approach women in an invasive and inappropriate manner.

### 3. Inference Independent of Bad Character

Prior acts evidence is admissible only if its relevance is independent of an intermediate inference that a defendant has a bad character. CRE 404(b).

Here, the doctrine of chances renders the evidence logically relevant, independent of the forbidden inference. See Spoto, 795 P.2d at 1319; People v. Mata, 56 P.3d 1169, 1174 (Colo.App.2002); Edward J. Imwinkelried, The Use of Evidence of an Accused's Uncharged Misconduct to Prove Mens Rea: The Doctrines Which Threaten to Engulf the Character Evidence Prohibition, 51 Ohio St. L.J. 575, 593–94 (1990). See also People v. Snyder, 874 P.2d 1076, 1080 (Colo.1994) (third prong of Spoto test does not require absence of any inference of bad character, only that logical relevance is independent of it).

Rather than suggesting to the jury a subjective inference of bad character, the doctrine of chances required the jurors to make an objective determination about the probability that defendant could have had so many similar encounters, yet, as he claimed, have maintained an innocent belief that his advances were nonthreatening. Jurors could thus rely on their common sense and knowledge of human experience, rather than on a subjective impression of defendant's character, to find his claim to an innocent state of mind improbable. See Spoto, 795 P.2d at 1319 (citing A.J. Wigmore, Evidence § 302 (1979)).

The jury's determination of improbability would, conversely, make it more probable that defendant possessed the requisite mens rea for harassment and stalking. *See id.;* Imwinkelried, 51 Ohio St. L.J. at 593–94. This determination can be reached without relying on an inference of bad character. *See Mata,* 56 P.3d at 1174.

### 4. Probative Value and Danger of Unfair Prejudice

■ To balance the evidence's probative value against the danger of unfair prejudice, we consider the importance of the material fact for which it is offered; whether that fact is disputed; the strength and extent of the chain of inferences necessary to establish that fact; and the availability of alternative means of proof. *Vialpando v. People,* 727 P.2d 1090, 1096 (Colo.1986).

To the extent the evidence was offered to prove the actus reus elements of the crimes charged, its probative value was negligible because those elements were not disputed, rendering the material facts of defendant's actions relatively unimportant. *See Yusem,* 210 P.3d at 464 n. 11 (although undisputed facts are material, the probative value of evidence tending to prove them is reduced).

Nevertheless, as it relates to the mens rea elements, the evidence's probative value was considerable, and thus not substantially outweighed by its prejudicial effect. Because it tended to show defendant's state of mind, it was of vital importance to the People's ability to prove harassment and stalking. Furthermore, as discussed, whether defendant possessed the requisite mens rea for those crimes was the only material fact in dispute. Moreover, in applying the doctrine of chances, no attenuated chain of inferences was required to infer defendant's intent or knowledge. Finally, because only defendant and Ms. R could testify as to the nature of their contact, no alternative proof existed by which the prosecution could rebut the defense that Ms. R's fear and distress was based merely on a misunderstanding.

Considering these factors, and that the evidence was probative of a material fact independent of an inference of bad character, we conclude that its probative value was not substantially outweighed by the danger of unfair prejudice. Thus, we discern no abuse of discretion in the trial court's decision to admit the testimony of Ms. C, Ms. Z, Ms. J, and Officers Lewis, Bromley, and Brockman.

### 5. Inadmissible Testimony and Harmless Error

As discussed, Ms. H and B.S.'s testimony did not support the inferences articulated by the prosecution and, therefore, did not satisfy the second prong of the *Spoto* test.

Nevertheless, even if the trial court's decision to admit that evidence was an abuse of discretion, any error was harmless. Although the testimony that defendant appeared to follow B.S. was unfavorable, it was vastly overshadowed by evidence of defendant's more threatening acts. Thus, in light of the abundant evidence supporting the jury's guilty verdict, we cannot conclude that the inadmissible evidence substantially influenced the verdict or impaired the fairness of the trial. *See Medina v. People,* 114 P.3d 845, 857 (Colo.2005); *People v. Gaffney,* 769 P.2d 1081, 1088–89 (Colo.1989).

## IV. Waiver of Counsel

Defendant next contends that his right to counsel was violated because, when he informed the trial court that he wished to represent himself, it failed to give him a pro se advisement. We disagree.

### A. Legal Framework and Standard of Review

■ The Sixth Amendment to the United States Constitution guarantees a criminal defendant's fundamental right to the assistance of counsel. *E.g., People v. Brante,* 232 P.3d 204, 207 (Colo.App.2009). Any waiver of a defendant's right to counsel requires a trial court's determination that that waiver is voluntary, knowing, and intelligent. *People v. Arguello,* 772 P.2d 87, 93 (Colo. 1989). Whether defendant's waiver was effective, under this standard, is a mixed question of fact and law that we review de novo. *People v. Alengi,* 148 P.3d 154, 159 (Colo. 2006).

### B. Advisement and Waiver

Before trial, defendant twice moved for appointment of alternate defense counsel. In both instances, the court explained that no conflict justified alternate counsel, and that, should he choose to represent himself, he would face considerable risks. Defendant agreed to abandon the motions and work with his public defender.

That public defender represented defendant at trial, but, before his trial on an unrelated matter, or the habitual phase and sentencing on this matter, defendant filed a third motion to represent himself.

Once more, upon receipt of defendant's motion, and also at a pro se advisement hearing, the court discussed at length the risks entailed were defendant to undertake to represent himself, particularly because he lacked any legal education or familiarity with trial procedures. Defendant persisted in exercising his right to represent himself, but accepted advisory counsel.

Just over one month later, at a hearing to set the date of defendant's habitual criminal trial, the court, presided over by a judge other than the one who gave defendant his *Arguello* advisement, asked whether defendant had counsel. The prosecutor said that defendant had fired his public defender, after receiving an *Arguello* advisement. Rather than conduct another advisement, the court asked defendant whether he wished to retain his former public defender. Defendant answered that he preferred to remain pro se.

Defendant now contends that this exchange violated his right to counsel because it "involved ... no more than a cursory look at what had happened in an unrelated trial, in a separate court, with a separate judge." However, defendant's claim that his receipt of an *Arguello* advisement was unrelated to his renewed waiver of counsel prior to his habitual trial is refuted by the record.

Indeed, the record shows that by that date, defendant had, essentially, received three *Arguello* advisements. That he abandoned his motions to represent himself after the first two indicated that he fully understood the risks of self-representation. Moreover, only a little more than one month had passed since the third advisement. Thus, we conclude that his waiver of his right to counsel, prior to the habitual phase, remained voluntary, knowing, and intelligent.

### V. Cumulative Trial Error

Because the evidentiary error discussed in section III was harmless, and we disagree with defendant's other contentions of trial error, we likewise disagree with his argument that the cumulative effect of alleged errors deprived him of a fair trial.

### VI. Conclusion

To the extent they reflect two separate stalking convictions, defendant's judgment and sentence are vacated, and the case is remanded to the trial court with directions to correct the mittimus to reflect defendant's conviction and sentence for a single count of stalking. Otherwise, the judgment and sentence are affirmed.

Judge PLANK * and Judge NIETO * concur.

---

* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and

§ 24–51–1105, C.R.S.2010.